## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

WALLACE E. KIRKPATRICK, )
STEPHEN J. KIRKPATRICK, and )
DESE RESEARCH, INC., )
)
      Plaintiffs, )
)
v. ) CIVIL ACTION NO. 01-JEO-2942-NE
)
THOMAS E. WHITE, Secretary of the )
Army and DANIEL V. WRIGHT, )
Brigadier General, United States Army )
Suspension and Debarment Official, )
)
      Defendants. )

**02 SEP 27 PM 3: 17**

**U.S. DISTRICT COURT**
**N.D. OF ALABAMA**

**ENTERED**

**SEP 27 2002**

### <u>MEMORANDUM OPINION</u>

The plaintiffs in this action request that the court review the determination of United States Army Brigadier General Daniel V. Wright, the Army Suspension and Debarment Official, to temporarily suspend the plaintiffs from future contracting with any agency in the executive branch of the United States Government under Federal Acquisition Regulation ("FAR") § 9.407. *See* 48 C.F.R. § 9.407. Pending before the court are various motions of the parties.

## I. PROCEDURAL BACKGROUND

### A. Administrative History

Plaintiff DESE Research, Inc. ("DESE"), is a research and engineering consulting firm specializing in the areas of defense, energy, space, and the environment. Wallace E. Kirkpatrick is the CEO and President of DESE, Stephen Kirkpatrick is the Senior Vice President of DESE. On July 14, 1997, the United States Army Space and Missile Defense Command awarded the plaintiffs a cost contract (DASG 60-97-C-0054). The contract was for the development of

*84*

software for the Image Enhancement System follow-on effort in support of the Kinetic Energy Anti-Satellite (KE ASAT) Weapons System Program.  Steve Tiwari ("Tiwari") was the Army's Program manager for the contract.  DESE requested and received approval to issue a cost-plus-fixed-fee subcontract to Titan Corporation ("Titan").  James T. Hackett ("Hackett") was assigned to work on the contract with DESE.

In September 1999, the Defense Contract Audit Agency audited the plaintiffs' contract and found that DESE had claimed costs that appeared to be for "lobbying" efforts and for other activities outside the scope of the contract.  The information was provided to the U.S. Army Criminal Investigation Command ("CID").

CID immediately began an investigation into the allegations of "lobbying" and that the costs for the same were improperly charged to the contract.  CID obtained various documents during its investigation, including the "Titan Activity Report" and "Trip Report" which were prepared by Hackett and submitted to DESE in support of billings that were ultimately submitted to the Army.  The purportedly improper conduct and billings were identified by the Army from the plaintiffs' documentation.  Specifically, the improper conduct was evidenced in the documentation that Titan submitted in support of its original billings to DESE, which were the basis of DESE's submission of billings to the government.

CID coordinated its investigation with the Army's Procurement Fraud Division ("PFD"), which is responsible for coordinating and monitoring criminal, civil, contractual, and administrative remedies in significant cases alleging fraud and corruption in Army contracts.  *See* 32 C.F.R. § 516.60.

On May 29, 2001, PFD issued show cause letters to DESE and Wallace Kirkpatrick

2

concerning possible violations of 18 U.S.C. § 1914[1] and FAR § 31.205.22(a). A letter was also sent to Tiwari. The letters requested that the plaintiffs respond to the allegations before PFD made any recommendation to the suspension authority. Through various contacts, counsel for the plaintiffs[2] received a second, more specific show cause letter stating that DESE and Kirkpatrick engaged in lobbying activities with appropriated funds in violation of FAR § 31.205.22(a) and 18 U.S.C. § 1913 and that DESE and Wallace Kirkpatrick presented false claims to the Army in violation of 18 U.S.C. § 287. Included in the second letter was a 35-page attachment, consisting of 83 specific questions to be addressed by the plaintiffs.

The plaintiffs submitted their response in September 2001. Sheryl Butler, an "Attorney-Advisor" with PFD, reviewed the response. She found the response to be "non-responsive in many respects to the 83 specific questions, but it did set forth Mr. Tiwari's and DESE's general arguments against the allegations of wrongdoing." (Butler Memo. at p. 3).[3] She also stated:

> . . . . By Mr. Tiwari's and DESE's own admission, at least ten meetings with members of Congress, or their staff, were characterized as social lunches/dinners or personal meetings; and at least seven of Mr. Hackett's interviews with the press were characterized as a normal exchange of information between journalists, as well as occasions at which Mr. Hackett expressed *his own opinions* and did not act as a spokesperson for the Army or KE ASAT.

(*Id.*)(italics in original). The parties diligently attempted to settle the disagreements, and, at one point, perceived that they had reached a "framework for settlement of this case." (*Id.* at p. 4).

---

[1] The letter incorrectly cited to § 1914 instead of § 1913.

[2] Mr. Howell Riggs is one of the counsel that represented the plaintiffs during the administrative proceedings and in this matter. He also represented Tiwari during the administrative proceedings.

[3] This document is found at document 12, Binder 1, "15 November 2001" at the front of the binder.

After settlement was not possible, Butler submitted a memorandum to General Wright as the

Suspension and Debarment Official, recommending suspension of Wallace Kirkpatrick, Stephen

Kirkpatrick, and DESE. She concluded as follows:

> a. A *prima facie* case exists that Mr. Tiwari, DESE, W. Kirkpatrick, and
> Mr. Hackett under a DESE subcontract, performed lobbying services under
> contract # DASG 60-97-C-0054 and that DESE and W. Kirkpatrick submitted
> claims for these unallowable costs to the government in violation of 18 U.S.C. §
> 287 and FAR section 31.205-22(a). Counsel for DESE has admitted that these are
> the activities for which Titan billed DESE and which were in turn billed to the
> government. In addition, other activities were performed and billed for which
> were outside the scope of work to include social meetings and personal
> journalistic exchanges with members of the press. These were also unallowable
> costs.
>
> b. There is no requirement that there be a contracting officer's decision or
> a criminal or civil justice adjudication before PFD seeks an administrative remedy
> to protect the government from DESE's continued lack of present responsibility.
>
> c. W. Kirkpatrick and S. Kirkpatrick are contractors within the meaning
> of FAR section 9.403. Through DESE, they submitted the bid and received the
> government contract. Additionally, they sought the subcontract with Titan. They
> conducted business with the government in this instance and may reasonably be
> expected to conduct business with the government in the future.
>
> d. DESE Research, Inc., W. Kirkpatrick, and S. Kirkpatrick are imputees
> of one another within the meaning of FAR subsections 9.406-5(a) and 9.406-5(b).
> S. Kirkpatrick was clearly performing his duties as the President of DESE when
> he entered into the contract with SMDC as evidenced by his signature on the
> document; and W. Kirkpatrick was clearly performing his duties as CEO of DESE
> when he rendered services under the contract.
>
> 5. Recommendation. That the Suspension and Debarment Official suspend
> Wallace Kirkpatrick, Stephen Kirkpatrick, and DESE Research, Inc., by signing
> the attached letters of notification.

(Butler Memo. at 5). General Wright concurred in her assessment and issued notices of

temporary suspension pursuant to FAR § 9.407 for Wallace Kirkpatrick, Stephen Kirkpatrick,

and DESE on November 15, 2001. He found that DESE, Hackett, and Wallace Kirkpatrick

performed lobbying services under the contract and submitted claims to these unallowable costs in violation of § 287 and FAR section 31.205-22(a).  He stated:

> Counsel for DESE has admitted that these are the services for which Titan billed DESE and which were in turn billed to the government.  In addition, other activities were performed and billed to the government which were outside the scope of work of the contract, to include social meetings and personal exchanges with members of the press.  These were also unallowable costs.  The administrative record that supports the suspension currently consists of this notice and the attached memorandum and supporting documentation.

(November 15, 2001 Letter to Mr. Riggs found at (PEX 1 at 1)).[4]  He also found that Stephen Kirkpatrick was due to be suspended because his company, Wallace Kirkpatrick, and Hackett performed unlawfully and he (Stephen Kirkpatrick) was "an imputee of DESE and W. Kirkpatrick within the meaning of FAR subsections 9.406-5(a) and 9.406-5(b)."  (November 15, 2001 Letter to Stephen Kirkpatrick).

The suspension notices informed the plaintiffs that (1) their names would appear in a government publication listing them as ineligible for government contracts; (2) agencies of the executive branch would not contract with them except for compelling reasons; (3) they could not conduct business as an agent, representative, or as a surety for a third party; and, (4) the Army would examine their affiliations with or relationships to any other organization doing business with the government to determine the impact of those ties on the responsibility of that organization to be a government contractor or subcontractor.  (Suspension Letters).  The letters also detailed the plaintiffs' right of further administrative review under FAR Subpart 9.4.  (*Id.*).

---

[4] References herein to "PEX ___ " are to the plaintiffs' exhibits that are attached to the verified petition (numbers 1- 35).

5

**B. Procedural History**

The plaintiffs sought no further administrative review.  Instead, they filed this action on November 19, 2001, as a "Verified Petition for Preliminary and Permanent Injunction."  (Doc. 1).[5]  (PEX 1 at 1).  The plaintiffs also filed a "Motion for a Temporary Restraining Order" (doc. 2); a "Declaration of Howell Roger Riggs," stating that notice to the defendants regarding the motion for a temporary restraining order should not be required prior to the determination of the motion by the court (doc. 3); a "Motion for Expedited Discovery" (doc. 4); and, a "Motion to Require Defendants to File the Administrative Record" (doc. 5).

The court granted the plaintiffs' motions for an order requiring the defendants to file the administrative record (doc. 6), to expedite discovery (doc. 7), and for a temporary restraining order prohibiting the defendants from publishing the suspension pending further order of the court (doc. 8).[6]  The case was set for a hearing on the motion for a preliminary injunction on November 28, 2001.  (Doc. 8 at 2).

The defendants filed a motion for a protective order staying discovery until the court ruled on the defendants' motion for summary judgment premised on a review of the administrative record.  (Doc. 10).

The defendants consented to an extension of the temporary restraining order until January 17, 2002, on November 28, 2001.  (Doc. 11).  They filed a copy of the "Administrative Record of that action made the basis of this proceeding and a certification that such record constitutes a true

---

[5] References herein to "Doc. ___" are to the numbers assigned the various pleadings in the record as assigned by the Clerk of the Court.  The numbers are located in the lower-right hand corner of each document.

[6] The court further ordered the plaintiffs to post a $10,000.00 bond.  (Doc. 8 at 2).  The bond was posted on November 21, 2001.  (Doc. 9).

6

and accurate copy of the Administrative Record that was presented to the deciding official."

(Doc. 12).  The record consists of six binders.[7]  The plaintiffs also filed a consent to the

extension of the temporary restraining order.  (Doc. 15).

Premised on the consent of the parties, the court extended the temporary restraining order

until January 17, 2002, when the court set the matter for a hearing.  (Doc. 13).  The court also set

the defendant's motion for a protective order (doc. 10) for a hearing on the same day (doc. 13).

The defendants filed a pleading opposing the plaintiffs' request for a preliminary

injunction.  (Doc. 14).  Included in the pleading was their motion for summary judgment.  (*Id*.).

On January 3, 2002, the plaintiffs filed a "Motion for Leave to File Discovery" from

CV 01-J-1633-NE in this case.  (Doc. 18).  The motion was granted on January 22, 2002.  (Doc.

23).[8]

The plaintiffs also filed a cross-motion for summary judgment and a response to the

defendants' motion for summary judgment.  (Doc. 19).

The defendants on January 10, 2002, moved to strike the plaintiffs' exhibits that were

identified as PEX 36-49.  (Doc. 20).  The motion also included a response to the plaintiffs'

response to the defendants' motion for summary judgment.  (*Id*.).  On the same day, the

defendants filed a "Corrected Version" of the same motion and response.  (Doc. 21).

The court conducted a hearing on the motion for a protective order as scheduled.  On

January 22, 2002, the court entered an order denying the defendants' motion for a protective

order.  (Doc. 24).  Specifically, the court stated:

---

[7] The binders are located in two boxes.  The boxes are marked "Doc. 12."

[8] These exhibits are in a separate bound document and contains exhibits designated at PEX 36-49.

. . . . From the administrative record and the parties' arguments, the court finds that the following unusual circumstances exist:

1. A meeting was attended by Mr. Riggs and Ms. Sheryl Butler, where Ms. Butler told Mr. Riggs that the meeting was for the lawyers only, that his clients did not need to be present, and that Wallace Kirkpatrick would be permitted to appear personally prior to any decision regarding Notice of Proposed Debarment. Binder 6 at Tab 3. A decision regarding the suspension was then made without the plaintiffs having an opportunity to be heard. Binder 6 at Tab 5. Counsel for the defendants agreed that no hearing was held.

2. The plaintiffs allege that the debarment and suspension process was undertaken for the purpose of punishment rather than for the reasons the regulations require.

3. Questions of the impartiality of the process and the impartiality of General Wright have been raised. General Costello testified in deposition that he had briefed everyone in the United States Army who would listen to him about this matter, including the Secretary of the Army, the Under Secretary of the Army, the Army Chief of Staff, and the Army Vice-Chief of Staff. The plaintiffs allege that no general officer in the United States Army is untainted by this information and that the manner in which General Wright made his decision is evidence of that. Additionally, the plaintiffs referred to issues regarding General Shinseki's and General Costello's relationships with Senator Smith.

4. Questions of whether General Wright considered all of the evidence have surfaced. The report of Ms. Butler, which accompanies General Wright's decision, makes no mention of all of the material in the administrative record which asserts present responsibility. Allegations of General Wright's acceptance of the recommendation of Ms. Butler without reviewing it have also been raised.

5. The plaintiff company has passed every other DCA audit without any questions regarding the allocation of cost, including the audit completed this year.

6. Questions have arisen regarding the timing of General Wright's review. The lead document relied by the defendants (Binder I) is dated November 15. Lieutenant Colonel O'Keeffe did not date it when he saw it. Colonel McFetridge reviewed it on November 13, two days before the document itself is dated. Similarly, Major Shields supposedly received the document on November 14, and nothing indicates that General Wright ever looked at it.

7. Other contracts at SMDC which do not have congressional liaison as an element of performance have had task orders issued under them. Mr. Lumer

testified that such an element had to be interpreted into the contracts.  Further, Mr. Tiwari's supervisors, Mr. Reeves and Mr. Dobbs considered the work in question to be within the contract.

8.  The statutory authority relied upon by the procurement fraud division for debarment of the plaintiffs, 18 U.S.C. § 1913, does not apply to contractors, but only to civil servants.

9.  Other incidents exist which are questionable, such as Ms. Butler's reference to the plaintiffs' submissions as "four volumes of manure," the failure to focus the decision on the issue of present responsibility, and the defendants' position that the plaintiffs' vigorous defense of the charges is evidence of guilt.

(Doc. 24 at 1-4). The parties agreed that the court would continue the temporary restraining order until a new hearing date on the merits could be set.  (*Id.*).

On January 28, 2002, the defendants filed a "Second Motion for Protective Order," requesting that the court issue instructions "prohibiting: (1) any inquiry into General Wright's deliberative processes and (2) any inquiry with regard to any legal advice General Wright may have received from Colonel McFetridge as his senior legal advisor." (Doc. 25 at 10-11).  The motion was summarily denied on the same day.  (Doc. 26).  A substantial amount of discovery was conducted in this matter by the plaintiffs.

On February 11, 2002, the plaintiffs submitted a "Notice of Filing" (First) with the Clerk of the Court.  Because of the numerous exhibits that were attached to the "Notice," the Clerk gave each exhibit a separate docket number.[9]  The exhibits include plaintiffs' exhibit numbers PEX 50-66.

On February 12, 2002, the defendants filed a motion to exclude plaintiffs' exhibits 1-56.[10]

---

[9] The plaintiffs' exhibits, which were identified as PEX 50-66 and consist of video depositions and transcripts, are docketed as court document numbers 31-47.

[10] These are PEX 1-56.

9

(Doc. 49).

On February 14, 2002, the plaintiffs filed a "Second Notice of Filing." Included in this submission were various exhibits which were filed by the Clerk of the Court as documents 50-64.[11] PEX 78-84 and 87-89 were not included as listed on the notice.[12]

This case was set for a hearing on the plaintiffs' motion for a preliminary injunction on February 14, 2002. (Doc. 30). The hearing was conducted as scheduled. (Doc. 67). At the hearing, the court admitted PEX 1-89. Shortly thereafter, the case was reassigned to another judge prior to any ruling on the motion for a preliminary injunction.

On March 1, 2002, the plaintiffs filed a "Third Notice of Filing." (Doc. 69). Included in this filing were labels,[13] a bound volume with exhibits PEX 94-149, and a video deposition and transcript of the testimony of Jay Garner (PEX 150, 150A & B).[14] The plaintiffs also filed a "Notice of Filing of Evidentiary Submission," directing the court to specific evidentiary references in the record that the court should focus its attention.[15] (Doc. 70).

On March 15, 2002, the defendants filed a "Notice of Filing of Evidentiary Submission," referencing PEX 50-52.[16]

On April 2, 2002, the defendants requested that the court reconsider its admission of

---

[11] Two exhibits, PEX 55A and PEX 57A (video depositions from transcripts PEX 55 & 57 (docketed as Doc. 36 & 38)), are docketed as numbers 50 & 51.

[12] They were received by the court in evidence at a later hearing on February 14, 2002.

[13] The notice requested that the labels, which are marked PEX 90 & 90A be placed on the George Williams transcript and video deposition, which was previously filed as PEX 85 & 85A (located at document 63).

[14] The Clerk of the Court filed all of these items under document number 69.

[15] The cite references are to the PEX numbers.

[16] The defendants preserved their objection to the court considering any evidence outside the scope of the administrative record. (Doc. 71).

exhibits 1-89 at the February 14, 2002 hearing and objected to any use of exhibits 90-150B. (Doc. 72). The defendants further requested oral argument on their motion for summary judgment. (*Id.*). The case was set for a status conference on May 2, 2002. (Doc. 73). The plaintiffs filed a response to the defendants' motion for reconsideration. (Doc. 75). The defendants filed a reply to the plaintiffs' response. (Doc. 77).

The defendants filed a request for an expedited hearing on the plaintiffs' request for a preliminary injunction. (Doc. 78). They also informed the court that the voluntary extension of the temporary restraining order was scheduled to expire on July 19, 2002. (Doc. 78).

On July 24, 2002, the case was reassigned to the undersigned magistrate judge. (Doc. 79). The parties have consented to final dispositive jurisdiction being within the authority of this court, pursuant to 28 U.S.C. § 636. (Doc. 82).

On August 5, 2002, the case was set for a hearing on the issue of what evidence would be considered by the court in ruling on the motions for preliminary injunction and for summary judgment. (Doc. 81). After a short discussion, the court determined that due to the voluminous record and the nature of the arguments, the case would be continued for further review. The parties agreed to a voluntary continuation of the temporary restraining order until the end of September 2002 .

The pending motions were set for a hearing on September 16, 2002. (Doc. 83). The parties presented evidence and arguments concerning the pending motions over two and one-half days. At the conclusion of the hearing, the court informed the parties of its decision to retain jurisdiction of this matter, to remand the same for further review pursuant to the applicable administrative regulations, and to enter a preliminary injunction. The court further informed the

11

parties of its intent to enter a memorandum opinion and order concerning the relevant issues.

## II. STANDARD OF REVIEW

### A. Generally

In *Miccosukee Tribe of Indians of Florida v. United States*, 1998 WL 1805539 (S.D. Fla.

1998), the court accurately stated the applicable standard to be applied in the present case as

follows:

> The APA accords great deference to agency actions. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996); *Organized Fishermen of Fla. v. Franklin*, 846 F. Supp. 1569, 1573 (S.D. Fla. 1994). This is true even at the summary judgment stage. *Cobb's History*, 87 F.3d at 1246. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).[17]
>
> Under this standard, a reviewing court should overturn an agency action

---

[17] 5 U.S.C. § 706(2) provides in full:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall–

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be–

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

only when it concludes there has been a clear violation of duty by agency officials. *Latecoere Int'l, Inc. v. U.S. Dept. of the Navy*, 19 F.3d 1342, 1356 (11ᵗʰ Cir. 1994). If the court finds a reasonable basis for the agency's action, it should "stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Id.* at 1356 (quotation and citation omitted). The court should not generally conduct a *de novo* inquiry nor reach its own conclusions. *Cobb's History*, 87 F.3d at 1246 (*citing Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)). Rather, the court should decide on the basis of the record the agency provides whether there is a rational basis for the agency's decision. *Lorion,* 470 U.S. at 744.

Conversely, if the record before the court does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court cannot evaluate the challenged action on the basis of the record before it, it may set aside the agency decision. *Cobb's History,* 87 F.3d at 1246. In those circumstances the usual action for the court is to remand the case to the agency for further explanation or investigation. *Id.* To determine whether an agency action is arbitrary and capricious:

> [T]he reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one. . . . Administrative decisions should be set aside in this context . . . only for substantial procedural or substantive reasons as mandated by statute . . . not simply because the court is unhappy with the result reached. The agency must use its best judgment in balancing the substantive issues. The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.

*Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541-42 (11ᵗʰ Cir. 1996) (*quoting North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538-39 (11ᵗʰ Cir. 1990)). To prove an agency's decision was arbitrary and capricious, the challenging party must show the record is devoid of reasonable evidence supporting the agency's decision. *Franklin,* 846 F. Supp. at 1573.

Ordinarily, a court should confine its review to the administrative record, which consists of all materials before the agency at the time of decision. *Id*; *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1095 (6ᵗʰ Cir. 1996), *cert. denied,* 117 S. Ct. 737 (1997). Review beyond the administrative record is justified if (1) the record does not adequately explain the agency's action, (2) it appears the agency relied on materials not included in the record, (3) it is necessary to clarify complex, technical terms involved in the decision, or (4) the challenging party has

made a strong showing of bad faith or improper behavior by the agency. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436-38 (9th Cir. 1988); *Franklin,* 846 F. Supp. at 1573.

*Miccosukee Tribe of Indians of Florida* at 13-14. *See also Water Works & Sewer Board of the City of Birmingham*, 983 F. Supp. 1052, 1065 (N.D. Ala.), *aff'd*, 162 F.3d 98 (11th Cir. 1998) (Table), *cert. denied*, 528 U.S. 951, 120 S. Ct. 374, 145 L. Ed. 2d 292 (1999).

As just stated, the general rule is that the reviewing court is limited to the administrative record. "There are exceptions to the general rule. See P[*reserve*] E[*ndangered*] A[*reas of*] C[*obb's*] H[*istory, Inc.*], 87 F.3d [1242,] 1246-47 & n.1 [(11th Cir. 1996)] (*citing Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436-37 (9th Cir. 1988)). Such exceptions are 'narrowly construed,' however, and the party seeking discovery has 'a heavy burden to show that supplementation is necessary.' *United States v. Amtreco, Inc.,* 806 F. Supp. 1004, 1006 (M.D. Ga. 1992) (*citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S. Ct. 814, 823, 28 L. Ed. 2d 136 (1971))." *Alabama-Tombigbee Rivers Coalition v. Norton*, 2002 WL 227032, *3 (N.D. Ala. 2002).

## B. Discussion

### 1. Discovery

In the present matter, the plaintiffs sought discovery and to supplement the administrative record based on the alleged bad faith or improper conduct of defendants or their agents. They were permitted to conduct extensive discovery after Judge Johnson determined that there were sufficient facts and circumstances justifying the same. The issue presently before the court concerns what use, if any, to make of the extensive evidence that was produced therefrom.

Having examined the entire file, including the administrative record and the supplemental

record in the form of the depositions and other documentary evidence (the PEX documents), the court finds that the plaintiffs have not made the requisite "strong showing of bad faith or improper behavior by the agency" to warrant the inclusion of the supplemental record (the PEX documents). *Miccosukee Tribe*, 1998 WL 1805539, at 14. In so finding the court recognizes that there are many issues surrounding the KE ASAT program at the relevant time, including a dispute between Senator Smith and General Costello over the expenditure of KE ASAT funds. However, the record does not support a conclusion that the decisionmaker in this case, General Wright, acted in bad faith or had an improper motive in granting the temporary suspension.[18]

## 2. The Merits

A government contractor suspected of fraud or criminal activity may be debarred from contracting with the government. Upon a showing of "adequate evidence," a contractor suspected of wrongdoing may be temporarily suspended from entering new contracts with the government. Specifically, there must be a showing of "adequate evidence" of the commission of fraudulent activity or a criminal offense in connection with the performance of the contract. 48 C.F.R. §§ 9.407-1(a) & (b) & 9.407-2(a)(1). A contractor may also be suspended if there is "adequate evidence" of conduct "that affects the present responsibility of a Government contractor or subcontractor."[19] 48 C.F.R. § 9.407-2(c). The regulations further provide:

---

[18] The court also notes that even if all the supplemental discovery was deemed to be relevant and admitted for purposes of the review of General Wright's decision, the ultimate determination by this court would not be different.

[19] The regulations regarding what is a responsible contractor provide, in pertinent part:

To be determined responsible, a prospective contractor must–

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (*see* 9.104-3(a));
(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
(c) Have a satisfactory performance record (*see* 48 C.F.R. § 9.104-3(b) and part 42, subpart 42.15).

. . . . The existence of a cause for suspension does not necessarily require that the contractor be suspended. The suspending official should consider the seriousness of the contractor's acts or omissions and may, but is not required to, consider remedial measures or mitigating factors, such as those set forth in 9.406-1(a). A contractor has the burden of promptly presenting to the suspending official evidence of remedial measures or mitigating factors when it has reason to know that a cause for suspension exists. The existence or nonexistence of any remedial measures or mitigating factors is not necessarily determinative of a contractor's present responsibility.

48 C.F.R. § 9.407-1(b)(2).

The plaintiffs are alleged to have violated 48 C.F.R. § 31.205-22(a), which provides in pertinent part:

(a) Costs associated with the following activities are unallowable:
. . . .
(3) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local officials to engage in similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation. . . .

48 C.F.R. § 31.205-22(a)(3). However, certain activities are exempted from this rule. The relevant regulation, 48 C.F.R. § 31.205-22(b)(1) provides:

(b) The following activities are excepted from the coverage of (a) above:

(1) Providing a technical and factual presentation of information on a topic

---

A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104-2;
    (d) Have a satisfactory record of integrity and business ethics;
    (e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (*see* 9.104-3(a));
    (f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (*see* 9.104-3(a)); and
    (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

48 C.F.R. § 9.104-1.

directly related to the performance of a contract through hearing testimony, statements or letters to the Congress or a state legislature, or subdivision, member, or cognizant staff member thereof, in response to a documented request (including a Congressional Record notice requesting testimony or statements for the record at a regularly scheduled hearing) made by the recipient member, legislative body or subdivision, or a cognizant staff member thereof; provided such information is readily obtainable and can be readily put in deliverable form; and further provided that costs under this section for transportation, lodging or meals are unallowable unless incurred for the purpose of offering testimony at a regularly scheduled Congressional hearing pursuant to a written request for such presentation made by the Chairman or Ranking Minority Member of the Committee or Subcommittee conducting such hearing.

. . . .

48 C.F.R. § 31.205-22(b)(1).  The pertinent regulations further provide:

(d) Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable (*see* 42.703-2) pursuant to this subsection complies with the requirements of this subsection.

(e) Existing procedures should be utilized to resolve in advance any significant questions or disagreements concerning the interpretation or application of this subsection.

48 C.F.R. § 31.205-22(d) & (e).

The plaintiffs failure to follow the requirements of § 31.205-22(a) also, according to the suspension notice, may constitute criminal violations of the "Anti-Lobbying Act" (18 U.S.C. §

1913[20]) and the "False Claims Act" (18 U.S.C. § 287[21]).

As noted at the outset, the purportedly improper conduct and billings were identified and determined from the documents submitted by Titan. Ms. Butler's legal memorandum to General Wright highlighted some of the conduct that allegedly violated the foregoing regulations and statutes. She noted the following conduct:

> "On August 29 [1997] we [Hackett, Tiwari, and W. Kirkpatrick] met Bill Stiers, DESE Washington representative, and the four of us called at the office of Rep. Bob Livingston, chairman of the House Appropriations Committee. We met with his key staffer, Paul Cambon, to explain the current status of the ASAT program, provide a video of the hover test, *and to seek Rep. Livingston's support in conference for the full $50M* that was approved for the program by the Senate for FY-98." (Tab 4, Encl 3, ¶ B)

> "Prepared and sent a draft letter to Bill Berl for the consideration of Rep. Randy Cunningham to send to his subcommittee chairman expressing his support for the KE ASAT program *and urging the chairman to recede to the Senate in conference on funding for the program.*" (Tab 4, Encl 2, ¶ R)

> "Accompanied Tiwari and Don Miller to a luncheon meeting with Tom Lankford, defense aide to Senator Bob Smith, *to urge him to keep the ASAT wording in the*

---

[20] 18 U.S.C. § 1913 provides:

> No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

18 U.S.C. § 1913.

[21] 18 U.S.C. § 287 provides:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

18 U.S.C. § 287.

*defense authorization*, which has not yet passed, and to consider possibilities for a supplemental [and] inclusion in the FY-99 defense authorization."  (Tab 4, Encl 7, ¶ F)

"We [Hackett, Tiwari, and W. Kirkpatrick] then went to the Senate Armed Services Committee on Capitol Hill to meet with Dr. Eric Thoemmes of the committee staff and Brian Green of the staff of the House National Security Committee, *to discuss prospects for future funding for the program*."  (Tab 4, Encl 11, ¶ B)

"Also asked Margo [Carlisle] *to seek Senator Cochran's support in the SAC for a $65M add-on for KE ASAT in the FY-99 budget*."  (Tab 4, Encl 12, ¶ E)

"Drafted letter from Alabama delegation to Rep. Curt Weldon *asking him to add $65M to FY-99 authorization for KE ASAT*."  (Tab 4, Encl 12, ¶ I)

(Butler Memo. at p. 2)(italics in original).  The defendants argue that these examples are "adequate evidence" that the plaintiffs improperly were involved in lobbying efforts and fraudulently charged them to the government.  They also argue that the plaintiffs have failed to exhaust their administrative remedies.[22]  (Doc. 14 at 23).  The plaintiffs counter that the conduct is not lobbying because 31 U.S.C. § 3152 ("The Byrd Amendment") specifically limits the definition of lobbying to specific contract actions and does not define lobbying as being related to procurement programs such as the one before the court.  (Doc. 19 at 6).  They also assert that the work performed by DESE, Titan, and Hackett was within the scope of work to be performed by them and that the work was directed and supervised by various federal officials, including the project manager (Tiwari).  (*Id*. at 7).  They lastly assert that requiring exhaustion of the administrative remedies in this matter would be futile because General Wright would be required to review his own decision.  (*Id*. at 13).  The defendants retort that General Wright acted

---

[22] *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S. Ct. 2457, 2467, 45 L. Ed. 2d 522 (1975), provides, "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."

reasonably in view of the evidence before him; that the Byrd Amendment does not apply to this case; and that the activities at issue are not within the scope of either of the DESE or Titan contracts. (Doc. 20 at 5-9).

Under the present facts, the court does not find that General Wright's decision to temporarily suspend the plaintiffs was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. The standard of adequate evidence that General Wright applied is an extremely low standard of proof. This court cannot conclude as a matter of law at this juncture that no violation occurred. To so find would be imprudent because the parties have not been afforded a full opportunity to pursue and present the applicable legal arguments in the administrative process provided by law. Accordingly, the court finds that this matter is due to be remanded to General Wright for further proceedings as provided by the administrative regulations.

To the extent that the plaintiffs argue that remand of this matter to General Wright for additional proceedings is futile, the court disagrees. The court has previously found no error in the General's handling of the temporary suspension. Additionally, upon further review, the General may consider the new information and arguments advanced in this court in opposition to the suspension. *See* 48 C.F.R. § 9.407-3(b). He will have the advantage of reviewing the extensive record that has been compiled by the parties as a consequence of the court allowed discovery. He will be able to more fully review the plaintiffs' arguments, advanced in detail at the hearing on the motions, that the conduct at issue did not involve "lobbying" and that it was

20

authorized by government officials.[23]  Additionally, he will have the opportunity to fully review

and determine the plaintiffs' present responsibility to continue in government contracting,

including any remedial measures undertaken by the plaintiffs and/or any mitigating factors.  *See*

48 C.F.R. § 9.407-1(b)(2).  While this review is pending, the court will maintain jurisdiction over

this matter for further review if such is necessary.[24]

### C. Preliminary Injunction

"The chief function of a preliminary injunction is to preserve the status quo until the

merits of the controversy can be fully and fairly adjudicated."  *Suntrust Bank v. Houghton Mifflin*

*Co.*, 268 F.3d 1257, 1265 (11ᵗʰ Cir. 2001), *citing Northeastern Fl. Chapter of Ass'n of Gen.*

*Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11ᵗʰ Cir. 1990).  "The basic

framework for our analysis remains, however, the standard test governing the issuance of

preliminary injunctions.  [The plaintiffs are] not entitled to relief in the form of a preliminary

injunction unless [they have] proved each of the following four elements: '(1) a substantial

likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction

were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction

may cause the defendant, and (4) that granting the injunction would not disserve the public

interest.'"  *Suntrust*, 268 F.3d at 1265 (*citing Am. Red Cross v. Palm Beach Blood Bank, Inc.*,

143 F.3d 1407, 1410 (11ᵗʰ Cir. 1998)).

---

[23] This will also permit him to review the plaintiffs argument that was advanced at the hearing on the motions that 10 U.S.C. § 2324 supports their argument that the conduct herein is not a violation of the lobbying limitations.  The remand will also allow the parties to more fully address the issues concerning the plaintiffs' claim that "constructive change" principles are applicable.  (*See* PEX 149).  Additionally, a remand will allow General Wright to examine the issue concerning the purportedly nonallowable costs involving meals and other "social" or personal visits.

[24] None of the parties voiced any opposition to the court's maintenance of jurisdiction in this matter while the administrative proceedings continue.

21

### 1. Likelihood of Success

The first consideration is the likelihood that the plaintiffs will succeed on the merits. Although the court is satisfied that the defendants had a basis for issuing the temporary suspension, the court is not similarly convinced that debarment is appropriate under the circumstances.

"In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to each of the four prerequisites. *Id.* (internal citation omitted); *see also Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction 'is the exception rather than the rule,' and plaintiff must clearly carry the burden of persuasion)." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Upon a review of the record presently before the court, it is evident that the plaintiffs very much have a "likelihood of success" on remand to General Wright due to the fact, as noted above, that the General must consider remedial measures or mitigating factors. *See* 48 C.F.R. §§ 9.406-1(a) & 9.407-1(b)(2). The administrative record is replete with information constituting mitigating factors and demonstrating what the General might deem to be evidence of present responsibility.[25] *See* 48 C.F.R. § 9.104-1.

### 2. Threat of Irreparable Injury

"A showing of irreparable injury is '"the sine qua non of injunctive relief."'" *Siegel*, 234 F.3d at 1176 (*citing Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (*quoting Frejlach v. Butler,* 573 F.2d

---

[25] Although General Wright referenced his concern during the deposition that the plaintiffs have a lack of understanding regarding applicable regulations, this may not be sufficient to support a debarment.

22

1026, 1027 (8th Cir. 1978)).  It is evident that the plaintiffs will suffer immediate and irreparable

harm if an injunction is not issued.  If the suspension is not stayed, the plaintiffs will lose their

right to compete for future government contracts and to receive the necessary additional awards

to continue their business.  The loss of such revenue and the substantial impact it would have on

the operations of DESE and its employees warrants a finding of irreparable injury.  The

publication of the suspension would also be extremely detrimental to the viability of DESE.

### 3. Harm to the Defendants

The defendants have a substantial interest in maintaining the integrity of its government

defense contracts and the procurement process.  Although judicial intervention in the

administrative process may cause some difficulties, the court finds that those difficulties are

minimal in this case.  The contract and conduct at issue in this case is complete.  The court is not

interfering with the daily operations of the defendants but is acting only to maintain the status

quo.  Due to the unusual status of this case, including the fact that the plaintiffs were permitted to

undertake extensive discovery and the advancement by the plaintiffs of more detailed arguments

in these proceedings (particularly at the hearing on the pending motions), the court finds that the

harm to the defendants is minimal.  Additionally, by issuing the injunction and remanding this

matter for further review consistent with the administrative rules and regulations, the defendants

can more fully consider and evaluate the merits of the plaintiffs' claims.

### 4. Public Interest

This court agrees with counsel for the defendants that it is not only the responsibility of

the government to question the integrity of a contractor suspected of violating the law, but a

failure to do so would be irresponsible.  (Doc. 14 at 24).  However, the court finds that it is in the

23

public interest in this case for the defendants to be afforded a fuller opportunity to examine the facts and the plaintiffs' present responsibility for additional contracts.

The applicable FARs provide, in part: "The serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and not for purposes of punishment. Agencies shall impose debarment or suspension to protect the Government's interest . . . ." 48 C.F.R. § 9.402. Prior to the incidents which are the basis of the present action, the plaintiffs had an exemplary history as evidenced in the administrative record. To create what might be irreversible consequences without the further development of the record (which is what the applicable regulations intend), would not be in the public interest in the present matter. This will not be the situation in every case. The public will be served by expeditious review of the present issues by the Army and the courts while the status quo is maintained. Granting a preliminary injunction does no harm to the defendants' concerns in this matter.

## III. CONCLUSION

Premised on the foregoing, the court finds that the defendants' motion for summary judgment is due to be denied (doc. 14), the plaintiffs' cross-motion for summary judgment is due to be denied (doc. 19), the defendants' motion to strike (doc. 20) is moot, the defendants' corrected motion to strike (doc. 21) is due to be denied in part and granted in part, the defendants' motion to exclude exhibits (doc. 49) is granted in part and denied in part,[26] and the defendants' motion for reconsideration (doc. 72) is moot.

---

[26] These motions are denied in part and granted in part because the court considered the deposition testimony of General Wright in determining that the futility argument was not well founded. This ruling does not limit any party's use of the material in any subsequent administrative or judicial proceeding.

**DONE**, this the _27th_ day of September, 2002.

_____
**JOHN E. OTT**
United States Magistrate Judge