IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 AUG 12 PM 3: 29

U.S. ...
H.D. OF ...

WALLACE E. KIRKPATRICK,  )
STEPHEN J. KIRKPATRICK, and  )
DESE RESEARCH, INC.,  )
                    )
      Plaintiffs,  )
                    )
v.  ) CIVIL ACTION NO. 01-JEO-2942-NE
                    )
THOMAS E. WHITE, Secretary of the  )
Army and DANIEL V. WRIGHT,  )
Brigadier General, United States Army  )
Suspension and Debarment Official,  )
                    )
      Defendants.  )

**ENTERED**

**AUG 1 3 2004**

## MEMORANDUM OPINION

This case is before the court on the plaintiffs' "Motion for Additional Relief" (doc. 89)

and the defendants' "Motion to Strike Extra-Record Evidence, Opposition to Plaintiffs' Motion

for Additional Relief, and Motion for Summary Judgment" (doc. 91). In their motion, the

plaintiffs request that the court grant relief additional to that provided in its September 27, 2002,

Memorandum Opinion (doc. 84).[1] The defendants oppose the motion and ask that the court

strike the "extra-record" evidence that is offered in support of the plaintiffs' motion.

## I. PROCEDURAL BACKGROUND

### A. Administrative History[2]

Plaintiff DESE Research, Inc. ("DESE"), is a research and engineering consulting firm

specializing in the areas of defense, energy, space, and the environment. Wallace E. Kirkpatrick

---

[1]References herein to "Doc. ___" are to the numbers assigned the various pleadings in the record as assigned by the Clerk of the Court. The numbers are located in the lower-right hand corner of each document.

[2]For the sake of completeness, the court sets out the administrative history as detailed in its September 27, 2002 Memorandum Opinion. (Doc. 84).

*94*

is the CEO and President of DESE, Stephen Kirkpatrick is the Senior Vice President of DESE. On July 14, 1997, the United States Army Space and Missile Defense Command awarded the plaintiffs a cost contract (DASG 60-97-C-0054). The contract was for the development of software for the Image Enhancement System follow-on effort in support of the Kinetic Energy Anti-Satellite (KE ASAT) Weapons System Program. Steve Tiwari ("Tiwari") was the Army's Program manager for the contract. DESE requested and received approval to issue a cost-plus-fixed-fee subcontract to Titan Corporation ("Titan"). James T. Hackett ("Hackett") was assigned to work by Titan on the contract with DESE.

In September 1999, the Defense Contract Audit Agency audited the plaintiffs' contract and found that DESE had claimed costs that appeared to be for "lobbying" efforts and for other activities outside the scope of the contract. The information was provided to the U.S. Army Criminal Investigation Command ("CID").

CID immediately began an investigation into the allegations of "lobbying" and that the costs for the same were improperly charged to the contract. CID obtained various documents during its investigation, including the "Titan Activity Report" and "Trip Report" which were prepared by Hackett and submitted to DESE in support of billings that were ultimately submitted to the Army. The purportedly improper conduct and billings were identified by the Army from the plaintiffs' documentation. Specifically, the improper conduct purportedly was evidenced in the documentation that Titan submitted in support of its original billings to DESE, which were the basis of DESE's submission of billings to the government.

CID coordinated its investigation with the Army's Procurement Fraud Division ("PFD"), which is responsible for coordinating and monitoring criminal, civil, contractual, and

2

administrative remedies in significant cases alleging fraud and corruption in Army contracts. *See* 32 C.F.R. § 516.60.

On May 29, 2001, PFD issued show cause letters to DESE and Wallace Kirkpatrick concerning possible violations of 18 U.S.C. § 1914[3] and FAR § 31.205.22(a). A letter was also sent to Tiwari. The letters requested that the plaintiffs respond to the allegations before PFD made any recommendation to the suspension authority. Through various contacts, counsel for the plaintiffs[4] received a second, more specific show cause letter stating that DESE and Kirkpatrick engaged in lobbying activities with appropriated funds in violation of FAR § 31.205.22(a) and 18 U.S.C. § 1913 and that DESE and Wallace Kirkpatrick presented false claims to the Army in violation of 18 U.S.C. § 287. Included in the second letter was a 35-page attachment, consisting of 83 specific questions to be addressed by the plaintiffs.

The plaintiffs submitted their response in September 2001. Sheryl Butler, an "Attorney-Advisor" with PFD, reviewed the response. She found the response to be "non-responsive in many respects to the 83 specific questions, but it did set forth Mr. Tiwari's and DESE's general arguments against the allegations of wrongdoing." (Butler Memo. at p. 3).[5] She also stated:

> . . . . By Mr. Tiwari's and DESE's own admission, at least ten meetings with members of Congress, or their staff, were characterized as social lunches/dinners or personal meetings; and at least seven of Mr. Hackett's interviews with the press were characterized as a normal exchange of information between journalists, as well as occasions at which Mr. Hackett expressed *his own opinions* and did not

---

[3] The letter incorrectly cited to § 1914 instead of § 1913.

[4] Mr. Howell Riggs is one of the counsel that represented the plaintiffs during the administrative proceedings and in this matter. He also represented Tiwari during the administrative proceedings.

[5] This document is found at document 12, Binder 1, "15 November 2001" at the front of the binder.

3

act as a spokesperson for the Army or KE ASAT.

(*Id.*) (italics in original).  The parties diligently attempted to settle their disagreements, and, at one point, perceived that they had reached a "framework for settlement of this case."  (*Id.* at p. 4).  After settlement was not possible, Butler submitted a memorandum to General Daniel V. Wright ("General Wright") as the Suspension and Debarment Official, recommending suspension of Wallace Kirkpatrick, Stephen Kirkpatrick, and DESE.  She concluded as follows:

> a. A *prima facie* case exists that Mr. Tiwari, DESE, W. Kirkpatrick, and Mr. Hackett under a DESE subcontract, performed lobbying services under contract # DASG 60-97-C-0054 and that DESE and W. Kirkpatrick submitted claims for these unallowable costs to the government in violation of 18 U.S.C. § 287 and FAR section 31.205-22(a).  Counsel for DESE has admitted that these are the activities for which Titan billed DESE and which were in turn billed to the government.  In addition, other activities were performed and billed for which [sic] were outside the scope of work to include social meetings and personal journalistic exchanges with members of the press.  These were also unallowable costs.

> b. There is no requirement that there be a contracting officer's decision or a criminal or civil justice adjudication before PFD seeks an administrative remedy to protect the government from DESE's continued lack of present responsibility.

> c. W. Kirkpatrick and S. Kirkpatrick are contractors within the meaning of FAR section 9.403.  Through DESE, they submitted the bid and received the government contract.  Additionally, they sought the subcontract with Titan.  They conducted business with the government in this instance and may reasonably be expected to conduct business with the government in the future.

> d. DESE Research, Inc., W. Kirkpatrick, and S. Kirkpatrick are imputees of one another within the meaning of FAR subsections 9.406-5(a) and 9.406-5(b).  S. Kirkpatrick was clearly performing his duties as the President of DESE when he entered into the contract with SMDC as evidenced by his signature on the document; and W. Kirkpatrick was clearly performing his duties as CEO of DESE when he rendered services under the contract.

> 5. Recommendation.  That the Suspension and Debarment Official suspend Wallace Kirkpatrick, Stephen Kirkpatrick, and DESE Research, Inc., by signing the attached letters of notification.

4

(Butler Mem. at 5). General Wright concurred in her assessment and issued notices of temporary

suspension pursuant to FAR § 9.407 for Wallace Kirkpatrick, Stephen Kirkpatrick, and DESE on

November 15, 2001. He found that DESE, Hackett, and Wallace Kirkpatrick performed

lobbying services under the contract and submitted claims for these unallowable costs in

violation of § 287 and FAR section 31.205-22(a). He stated:

> Counsel for DESE has admitted that these are the services for which Titan billed
> DESE and which were in turn billed to the government. In addition, other
> activities were performed and billed to the government which were outside the
> scope of work of the contract, to include social meetings and personal exchanges
> with members of the press. These were also unallowable costs. The
> administrative record that supports the suspension currently consists of this notice
> and the attached memorandum and supporting documentation.

(November 15, 2001 Letter to Mr. Riggs found at (PEX 1 at 1)).[6] He also found that Stephen

Kirkpatrick was due to be suspended because his company, Wallace Kirkpatrick, and Hackett

performed unlawfully and he (Stephen Kirkpatrick) was "an imputee of DESE and W.

Kirkpatrick within the meaning of FAR subsections 9.406-5(a) and 9.406-5(b)." (November 15,

2001 Letter to Stephen Kirkpatrick).

The suspension notices informed the plaintiffs that (1) their names would appear in a

government publication listing them as ineligible for government contracts; (2) agencies of the

executive branch would not contract with them except for compelling reasons; (3) they could not

conduct business as an agent, representative, or as a surety for a third party; and, (4) the Army

would examine their affiliations with or relationships to any other organization doing business

with the government to determine the impact of those ties on the responsibility of that

---

[6] References herein to "PEX ___" are to the plaintiffs' exhibits that are attached to the verified petition (numbers 1-35).

organization to be a government contractor or subcontractor.  (Suspension Letters).  The letters

also detailed the plaintiffs' right of further administrative review under FAR Subpart 9.4.  (*Id.*).

## B. Procedural History

The plaintiffs sought no further administrative review.  Instead, they filed this action on

November 19, 2001, as a "Verified Petition for Preliminary and Permanent Injunction."  (Doc.

1).  (PEX 1 at 1).  The plaintiffs also filed a "Motion for a Temporary Restraining Order" (doc.

2); a "Declaration of Howell Roger Riggs," stating that notice to the defendants regarding the

motion for a temporary restraining order should not be required prior to the determination of the

motion by the court (doc. 3); a "Motion for Expedited Discovery" (doc. 4); and, a "Motion to

Require Defendants to File the Administrative Record" (doc. 5).

The court granted the plaintiffs' motions for an order requiring the defendants to file the

administrative record (doc. 6), to expedite discovery (doc. 7), and for a temporary restraining

order prohibiting the defendants from publishing the suspension pending further order of the

court (doc. 8).[7]  The case was set for a hearing on the motion for a preliminary injunction on

November 28, 2001.  (Doc. 8 at 2).

The defendants filed a motion for a protective order staying discovery until the court

ruled on the defendants' motion for summary judgment premised on a review of the

administrative record.  (Doc. 10).

The defendants consented to an extension of the temporary restraining order until January

17, 2002, on November 28, 2001.  (Doc. 11).  They filed a copy of the "Administrative Record of

---

[7] The court further ordered the plaintiffs to post a $10,000.00 bond.  (Doc. 8 at 2).  The bond was posted on November 21, 2001.  (Doc. 9).

that action made the basis of this proceeding and a certification that such record constitutes a true and accurate copy of the Administrative Record that was presented to the deciding official." (Doc. 12). The record at that time consisted of six binders.[8] The plaintiffs also filed a consent to the extension of the temporary restraining order. (Doc. 15).

Premised on the consent of the parties, the court extended the temporary restraining order until January 17, 2002, when the court set the matter for a hearing. (Doc. 13). The court also set the defendant's motion for a protective order (doc. 10) for a hearing on the same day (doc. 13).

The defendants filed a pleading opposing the plaintiffs' request for a preliminary injunction. (Doc. 14). Included in the pleading was their motion for summary judgment. (*Id.*).

On January 3, 2002, the plaintiffs filed a "Motion for Leave to File Discovery" from CV 01-J-1633-NE in this case. (Doc. 18). The motion was granted on January 22, 2002. (Doc. 23).[9]

The plaintiffs also filed a cross-motion for summary judgment and a response to the defendants' motion for summary judgment. (Doc. 19).

The defendants on January 10, 2002, moved to strike the plaintiffs' exhibits that were identified as PEX 36-49. (Doc. 20). The motion also included a reply to the plaintiffs' response to the defendants' motion for summary judgment. (*Id.*). On the same day, the defendants filed a "Corrected Version" of the same motion and response. (Doc. 21).

The court conducted a hearing on the motion for a protective order as scheduled. On January 22, 2002, the court entered an order denying the defendants' motion for a protective

---

[8] The binders are located in two boxes. The boxes are marked "Doc. 12."

[9] These exhibits are in a separate bound document and include only exhibits PEX 36-49.

7

order. (Doc. 24). Specifically, the court stated:

> . . . . From the administrative record and the parties' arguments, the court finds that the following unusual circumstances exist:

> 1. A meeting was attended by Mr. Riggs and Ms. Sheryl Butler, where Ms. Butler told Mr. Riggs that the meeting was for the lawyers only, that his clients did not need to be present, and that Wallace Kirkpatrick would be permitted to appear personally prior to any decision regarding Notice of Proposed Debarment. Binder 6 at Tab 3. A decision regarding the suspension was then made without the plaintiffs having an opportunity to be heard. Binder 6 at Tab 5. Counsel for the defendants agreed that no hearing was held.

> 2. The plaintiffs allege that the debarment and suspension process was undertaken for the purpose of punishment rather than for the reasons the regulations require.

> 3. Questions of the impartiality of the process and the impartiality of General Wright have been raised. General Costello testified in deposition that he had briefed everyone in the United States Army who would listen to him about this matter, including the Secretary of the Army, the Under Secretary of the Army, the Army Chief of Staff, and the Army Vice-Chief of Staff. The plaintiffs allege that no general officer in the United States Army is untainted by this information and that the manner in which General Wright made his decision is evidence of that. Additionally, the plaintiffs referred to issues regarding General Shinseki's and General Costello's relationships with Senator Smith.

> 4. Questions of whether General Wright considered all of the evidence have surfaced. The report of Ms. Butler, which accompanies General Wright's decision, makes no mention of all of the material in the administrative record which asserts present responsibility. Allegations of General Wright's acceptance of the recommendation of Ms. Butler without reviewing it have also been raised.

> 5. The plaintiff company has passed every other DCA audit without any questions regarding the allocation of cost, including the audit completed this year.

> 6. Questions have arisen regarding the timing of General Wright's review. The lead document relied on by the defendants (Binder I) is dated November 15. Lieutenant Colonel O'Keeffe did not date it when he saw it. Colonel McFetridge reviewed it on November 13, two days before the document itself is dated. Similarly, Major Shields supposedly received the document on November 14, and nothing indicates that General Wright ever looked at it.

7.  Other contracts at SMDC which do not have congressional liaison as an element of performance have had task orders issued under them.  Mr. Lumer testified that such an element had to be interpreted into the contracts.  Further, Mr. Tiwari's supervisors, Mr. Reeves and Mr. Dobbs considered the work in question to be within the contract.

8.  The statutory authority relied upon by the procurement fraud division for debarment of the plaintiffs, 18 U.S.C. § 1913, does not apply to contractors, but only to civil servants.

9.  Other incidents exist which are questionable, such as Ms. Butler's reference to the plaintiffs' submissions as "four volumes of manure," the failure to focus the decision on the issue of present responsibility, and the defendants' position that the plaintiffs' vigorous defense of the charges is evidence of guilt.

(Doc. 24 at 1-4).  The parties agreed that the court would continue the temporary restraining order until a new hearing date on the merits could be set.  (*Id.*).

On January 28, 2002, the defendants filed a "Second Motion for Protective Order," requesting that the court issue instructions "prohibiting: (1) any inquiry into General Wright's deliberative processes and (2) any inquiry with regard to any legal advice General Wright may have received from Colonel McFetridge as his senior legal advisor." (Doc. 25 at 10-11).  The motion was summarily denied on the same day.  (Doc. 26).  A substantial amount of discovery was conducted in this matter by the plaintiffs.

On February 11, 2002, the plaintiffs submitted a "Notice of Filing" (First) with the Clerk of the Court.  Because of the numerous exhibits that were attached to the "Notice," the Clerk gave each exhibit a separate docket number.[10]  The exhibits include plaintiffs' exhibit numbers PEX 50-66.

---

[10] The plaintiffs' exhibits, which were identified as PEX 50-66 and consist of video depositions and transcripts, are docketed as court document numbers 31-47.

9

On February 12, 2002, the defendants filed a motion to exclude plaintiffs' exhibits 1-56.[11] (Doc. 49).

On February 14, 2002, the plaintiffs filed a "Second Notice of Filing." Included in this submission were various exhibits which were filed by the Clerk of the Court as documents 50-64.[12] PEX 78-84 and 87-89 were not included as listed on the notice.[13]

This case was set for a hearing on the plaintiffs' motion for a preliminary injunction on February 14, 2002. (Doc. 30). The hearing was conducted as scheduled. (Doc. 67). At the hearing, the court admitted PEX 1-89. Shortly thereafter, the case was reassigned to another judge prior to any ruling on the motion for a preliminary injunction.

On March 1, 2002, the plaintiffs filed a "Third Notice of Filing." (Doc. 69). Included in this filing were labels,[14] a bound volume with exhibits PEX 94-149, and a video deposition and transcript of the testimony of Jay Garner (PEX 150, 150A & B).[15] The plaintiffs also filed a "Notice of Filing of Evidentiary Submission," directing the court to specific evidentiary references in the record that the court should focus its attention.[16] (Doc. 70).

On March 15, 2002, the defendants filed a "Notice of Filing of Evidentiary Submission,"

---

[11] These are PEX 1-56.

[12] Two exhibits, PEX 55A and PEX 57A (video depositions from transcripts PEX 55 & 57 (docketed as Doc. 36 & 38)), are docketed as numbers 50 & 51.

[13] They were received by the court in evidence at a later hearing on February 14, 2002.

[14] The notice requested that the labels, which are marked PEX 90 & 90A be placed on the George Williams transcript and video deposition, which was previously filed as PEX 85 & 85A (located at document 63).

[15] The Clerk of the Court filed all of these items under document number 69.

[16] The cite references are to the PEX numbers.

10

referencing PEX 50-52.[17]

On April 2, 2002, the defendants requested that the court reconsider its admission of exhibits 1-89 at the February 14, 2002 hearing and objected to any use of exhibits 90-150B. (Doc. 72). The defendants further requested oral argument on their motion for summary judgment. (*Id*.). The case was set for a status conference on May 2, 2002. (Doc. 73). The plaintiffs filed a response to the defendants' motion for reconsideration. (Doc. 75). The defendants filed a reply to the plaintiffs' response. (Doc. 77).

The defendants filed a request for an expedited hearing on the plaintiffs' request for a preliminary injunction. (Doc. 78). They also informed the court that the voluntary extension of the temporary restraining order was scheduled to expire on July 19, 2002. (Doc. 78).

On July 24, 2002, the case was reassigned to the undersigned magistrate judge. (Doc. 79). The parties have consented to final dispositive jurisdiction being within the authority of this court, pursuant to 28 U.S.C. § 636. (Doc. 82).

On August 5, 2002, the case was set for a hearing on the issue of what evidence would be considered by the court in ruling on the motions for preliminary injunction and for summary judgment. (Doc. 81). After a short discussion, the court determined that due to the voluminous record and the nature of the arguments, the case would be continued for further review. The parties agreed to a voluntary continuation of the temporary restraining order until the end of September 2002 .

The pending motions were set for a hearing on September 16, 2002. (Doc. 83). The

---

[17] The defendants preserved their objection to the court considering any evidence outside the scope of the administrative record. (Doc. 71).

parties presented evidence and arguments concerning the pending motions over two and one-half

days.  At the conclusion of the hearing, the court informed the parties of its decision to retain

jurisdiction of this matter, to remand the same for further review pursuant to the applicable

administrative regulations, and to enter a preliminary injunction.

The court then entered its Memorandum Opinion on September 27, 2002.  (Doc. 84).  In

its Opinion, this court found that the "plaintiffs ha[d] not made the requisite 'strong showing of

bad faith or improper behavior by the agency' to warrant the inclusion of the supplemental record

(the PEX documents)" in this court's consideration and that "the record [did] not support a

conclusion that the decisionmaker in this case, General Wright, acted in bad faith or had an

improper motive in granting the temporary suspension."  (Doc. 84 at p. 15).  At the time of its

Memorandum Opinion, the court could not find that General Wright's decision to temporarily

suspend the plaintiffs was arbitrary or capricious, an abuse of discretion, or otherwise not in

accordance with the law, and further noted that to do so would be imprudent because the parties

had not been afforded the full opportunity to pursue and present the applicable legal arguments in

the administrative process that the law provides.  Therefore, the court remanded the matter to

General Wright for further proceedings so that General Wright could consider the new

information and arguments that were advanced in this court in opposition to the suspension;

specifically, the extensive record compiled by the parties as a consequence of the court allowed

discovery and the plaintiffs' arguments as set out in the hearing on the motions that the conduct

at issue did not involve "lobbying" and that it was authorized by government officials.  (Doc. 84

at pp. 20-21).  Additionally, General Wright had the opportunity to review and determine the

plaintiffs' present responsibility to continue in government contracting.  The court maintained

12

jurisdiction over the action while the review was pending.  (Doc. 84 at p. 21).

Because the court found that granting the motion for preliminary injunction would do no

harm to the defendants' concerns in this matter and that the public interest would best be served

by an expeditious review of the issues by the Army while the status quo was preserved, it granted

the plaintiffs' motion for preliminary injunction.  (Doc. 84 at p.24).

Thereafter, on October 17, 2002, plaintiffs' counsel Howell Roger Riggs wrote General

Wright a letter formally requesting that he terminate the plaintiffs' suspension *ab initio* the

plaintiffs committed no offense that justified suspension, DESE was and always had been

"presently responsible," and there was never any need for immediate action to protect the

government so as to justify the suspension decision.  (Doc. 89, p. 3).[18]  On October 25, 2002,

General Wright conducted an Administrative Hearing, which Sheryl Butler on behalf of the

Agency, Howell Roger Riggs and Nathan Harvey on behalf of the plaintiffs, Lieutenant Colonel

Gregory Coe and Christine McCommas of the Procurement Fraud Division attended.  Also

present were Wallace Kirkpatrick, Stephen Kirkpatrick, Michael Kirkpatrick, and Wil Etbauer,

all of DESE Research.  Presentations were made by Howell Roger Riggs, Wallace Kirkpatrick,

Stephen Kirkpatrick, Harvey Nathan, Michael Kirkpatrick, and Wil Etbauer.  (Administrative

Hearing Transcript at pp. 2-4).[19]

After the hearing, General Wright issued a written decision on December 19, 2002,

stating that "[w]hile I find the original suspension actions to be justified, based on my careful

review of the extensive record before me, I find that the facts and circumstances in this case

---

[18]Mr. Riggs' October 17, 2002 letter is located at Exhibit A to document 89.

[19]The Administrative Hearing Transcript is located at document 92, Exhibit 1.

warrant a termination of the suspension action." (Doc. 89 at Exhibit B; Doc. 92 at DEX 2).

On January 13, 2003, the plaintiffs petitioned General Wright to reconsider his decision not to

terminate the suspensions *ab initio*, as well as other portions of his decision, and submitted

additional written matters for his consideration. (Doc. 89, Exhibit C). On January 16, 2003,

General Wright issued a written decision refusing to alter or amend any part of his December 19,

2002 decision because he found "no compelling circumstances warranting a termination of the

suspensions *ab initio*." (Doc. 89, Exhibit 5; Doc. 92 at DEX 3).

      Thereafter, on January 24, 2003, the plaintiffs filed their motion asking that the court

provide them additional relief from General Wright's final determination. (Doc. 89). The

plaintiffs specifically state that they come before the court seeking "to clear their name and

remove the cloud that hangs over their futures as a result of General Wright's suspension

decision." (Doc. 89, p. 5). On March 3, 2003, the defendants filed their opposition to the

plaintiffs' motion for additional relief, as well as a motion to strike extra-record evidence offered

by the plaintiffs and a motion for summary judgment (doc. 91)[20] and their exhibits in support

thereof (doc. 92). The plaintiffs filed their reply (doc. 93) on March 17, 2003, and the court took

the matter under submission.

## II. STANDARD OF REVIEW

      As set forth in this court's pervious Memorandum Opinion, the applicable standard to be

applied in the present case is as follows:

> The APA accords great deference to agency actions. *Preserve Endangered*
> *Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,* 87 F.3d 1242, 1246

---

[20]Doc. 91 is one document entitled "Defendants' Motion to Strike Extra-Record Evidence, Opposition to Plaintiffs'
Motion for Additional Relief, and Motion for Summary Judgment."

(11th Cir. 1996); *Organized Fishermen of Fla. v. Franklin,* 846 F. Supp. 1569, 1573 (S.D. Fla. 1994). This is true even at the summary judgment stage. *Cobb's History,* 87 F.3d at 1246. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).[21]

Under this standard, a reviewing court should overturn an agency action only when it concludes there has been a clear violation of duty by agency officials. *Latecoere Int'l, Inc. v. U.S. Dept. of the Navy,* 19 F.3d 1342, 1356 (11th Cir. 1994). If the court finds a reasonable basis for the agency's action, it should "stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Id.* at 1356 (quotation and citation omitted). The court should not generally conduct a *de novo* inquiry nor reach its own conclusions. *Cobb's History,* 87 F.3d at 1246 (*citing Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)). Rather, the court should decide on the basis of the record the agency provides whether there is a rational basis for the agency's decision. *Lorion,* 470 U.S. at 744.

Conversely, if the record before the court does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court cannot evaluate the challenged action on the basis of the record before it, it may set aside the agency decision. *Cobb's History,* 87 F.3d at 1246. In those circumstances the usual action for the court is to remand the case to the agency for

---

[21] 5 U.S.C. § 706(2) provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

>> (1) compel agency action unlawfully withheld or unreasonably delayed; and

>> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>> (B) contrary to constitutional right, power, privilege, or immunity;
>>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>> (D) without observance of procedure required by law;
>>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. 5 U.S.C. § 706.

further explanation or investigation.  *Id.*  To determine whether an agency action is arbitrary and capricious:

> [T]he reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  This inquiry must be searching and careful, but the ultimate standard of review is a narrow one. . . .  Administrative decisions should be set aside in this context . . . only for substantial procedural or substantive reasons as mandated by statute . . . not simply because the court is unhappy with the result reached.  The agency must use its best judgment in balancing the substantive issues.  The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.

*Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541-42 (11th Cir. 1996) (*quoting North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538-39 (11th Cir. 1990)).  To prove an agency's decision was arbitrary and capricious, the challenging party must show the record is devoid of reasonable evidence supporting the agency's decision.  *Franklin,* 846 F. Supp. at 1573.

> Ordinarily, a court should confine its review to the administrative record, which consists of all materials before the agency at the time of decision.  *Id; James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1095 (6th Cir. 1996), *cert. denied,* 117 S. Ct. 737 (1997).  Review beyond the administrative record is justified if (1) the record does not adequately explain the agency's action, (2) it appears the agency relied on materials not included in the record, (3) it is necessary to clarify complex, technical terms involved in the decision, or (4) the challenging party has made a strong showing of bad faith or improper behavior by the agency.  *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436-38 (9th Cir. 1988); *Franklin,* 846 F. Supp. at 1573.

*Miccosukee Tribe of Indians of Florida v. United States,* 1998 WL 1805539, *13-14 (S.D. Fla. 1998).  *See also Water Works & Sewer Board of the City of Birmingham,* 983 F. Supp. 1052, 1065 (N.D. Ala.), *aff'd,* 162 F.3d 98 (11th Cir. 1998) (Table), *cert. denied,* 528 U.S. 951, 120 S. Ct. 374, 145 L. Ed. 2d 292 (1999).

As just stated, the general rule is that the reviewing court is limited to the administrative record.  "There are exceptions to the general rule.  *See P[reserve] E[ndangered] A[reas of]*

16

C[obb's] H[istory, Inc.], 87 F.3d [1242,] 1246-47 & n.1 [(11th Cir. 1996)] (*citing Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436-37 (9th Cir. 1988)).  Such exceptions are 'narrowly construed,' however, and the party seeking discovery has 'a heavy burden to show that supplementation is necessary.'  *United States v. Amtreco, Inc.,* 806 F. Supp. 1004, 1006 (M.D. Ga. 1992) (*citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S. Ct. 814, 823, 28 L. Ed. 2d 136 (1971))."  *Alabama-Tombigbee Rivers Coalition v. Norton,* 2002 WL 227032, *3 (N.D. Ala. 2002).

While this court, through Judge Inge Johnson, determined that additional discovery was necessary in this case, the court was of the opinion that the appropriate use of the additional discovery was with General Wright and not this court.  (Doc. 84. at pp. 15 & 20).  Therefore, the court now has before it the administrative record, as it existed when General Wright made his initial decision to suspend the plaintiffs from government contracting, as well as the administrative record that General Wright relied upon when he reviewed the matter at the court's direction.

The court, however, declines to consider the extra-record evidence, particularly the declaration of Harry D. Cleaver, Jr. (doc. 89, exhibit F), since it was not before General Wright when he conducted his January 16, 2003 review.  Accordingly, to that extent, the defendants' motion to strike is due to be granted.

## III. DISCUSSION

In their "Motion for Additional Relief" (doc. 89), the plaintiffs seek an order of the court providing as follows:

> . . . . (1) finding that Plaintiffs committed no offense which justified their

17

being suspended from government contracting, (2) voiding *ab initio* General Wright's November 15, 2001 suspension of Plaintiffs for allegedly billing the government for unallowable costs incurred during the performance of contract DASG60-97-C0054 (the "Contract"), (3) permanently enjoining Defendants from indicating that Plaintiffs have ever been suspended, and (4) finding Plaintiff to be the "prevailing party" in this action, as that phrase is defined by the Equal Access to Justice Act, 5 U.S.C. §504 ("EAJA").

(Doc. 89, p. 1).  The plaintiffs acknowledge that the Administrative Record that is now before the court is complete and that the case is ripe for judicial review.  (Doc. 89, p. 7).  The plaintiffs request this additional relief because General Wright's suspension of the termination is only "technically less harmful . . . than was his original decision, substantively, his position is unchanged . . . [and] without relief from this [c]ourt, Plaintiff's reputations will be irretrievably besmirched and they face the prospect of financial ruin."  (Doc. 89, p. 7).

### A. Unallowable Costs

General Wright's December 19, 2002, and January 16, 2003, decisions affirm his finding that the plaintiffs violated FAR § 31.205-22(a), which provides that costs associated with the following activities are unallowable:

> (3) Any attempt to influence (i) The introduction of Federal . . . legislation, or (ii) the enactment or modification of any pending Federal . . . legislation through communication with any member or employee of the Congress . . . , or with any government official or employee in connection with a decision to sign or veto enrolled legislation[.]

### B. Contract Scope of Work

General Wright found that the activities described within the Hackett Reports were not within the Contract Scope of Work ("SOW").  The plaintiffs vehemently disagree with this finding.  However, instead of articulating how those activities are within the SOW, the plaintiffs argue that the SOW was "negotiated, reviewed, and approved by the SMDC contracts office and

legal office" and that the subcontract SOW was approved by the Defense Contract Administration Agency in Birmingham, Alabama. (Doc. 89, p. 8).

In support of their argument that the submitted costs were within the contract SOW, the plaintiffs argue that (1) the Titan subcontract was made at the request of the government (Tiwari); (2) all of Mr. Hackett's contacts with members of Congress or their staff were at the direction of the government Program Manager (Tiwari) and were in support of an Army program that had fierce opponents and supporters; (3) Tiwari and Hackett's efforts resulted in $137 million of funding over several years; (4) Tiwari's supervisor, William C. Reeves believes the costs fall within the SOW provisions; and, (5) Tiwari was directed by the SMDC Commander to get the funds needed for his program any way he could or his job would be eliminated and other SMDC officials also requested that Tiwari contact members of Congress or their staffs to restore and fund the KE-ASAT program. (Doc. 89, pp. 7-13).

The defendants retort that "it is fantasy of epic proportion to imply an authorization to conduct lobbying activities from a plain reading of the plaintiffs' technically-based scopes of work at issue in this case." (Doc. 91, p. 29). While the defendants see no need to delve any further than that into the issue, they offer further that any direction Tiwari may have made was in direct conflict with the limitations on his authority under the FAR. Furthermore, the defendants argue, the plaintiffs should have known that Tiwari was not authorized to direct them to perform duties outside their scope of work and should have refused his direction. Instead of refusing to participate, the plaintiffs have maintained that their activities were not in violation of FAR 31.205-22.

The court agrees with the defendants. None of the plaintiffs' arguments support the

19

contention that the costs submitted were within the SOW. What the arguments do support is that

Tiwari prompted the actions by the plaintiffs. However, Tiwari's direction does not render the

plaintiffs justified in their actions if the activities described within the Hackett Reports were in

violation of FAR 31.205-22.

## C.  FAR § 31.205

The plaintiffs next argue that General Wright has never explained why the Hackett

Reports constitute costs incurred in the furtherance of "lobbying" and that the activities described

therein do not implicate any of the six types of unallowable activities described in FAR §

31.205.22(a) (48 C.F.R. § 31.205-22(a)).    Again, the pertinent part of that section provides:

> (a) Costs associated with the following activities are unallowable:
>
>     . . . .
>
>     (3) Any attempt to influence (i) the introduction of Federal, state, or local
> legislation, or (ii) the enactment or modification of any pending Federal, state, or
> local legislation through communication with any member or employee of the
> Congress or state legislature (including efforts to influence state or local officials
> to engage in similar lobbying activity), or with any government official or
> employee in connection with a decision to sign or veto enrolled legislation. . . .

48 C.F.R. § 31.205-22(a)(3).  However, certain activities are exempted from this rule.  The

relevant regulation, 48 C.F.R. § 31.205-22(b)(1), provides in pertinent part:

> (b) The following activities are excepted from the coverage of (a) above:
>
>     (1) Providing a technical and factual presentation of information on a topic
> directly related to the performance of a contract through hearing testimony,
> statements or letters to the Congress or a state legislature, or subdivision, member,
> or cognizant staff member thereof, in response to a documented request (including
> a Congressional Record notice requesting testimony or statements for the record at
> a regularly scheduled hearing) made by the recipient member, legislative body or
> subdivision, or a cognizant staff member thereof; provided such information is
> readily obtainable and can be readily put in deliverable form; and further provided
> that costs under this section for transportation, lodging or meals are unallowable
> unless incurred for the purpose of offering testimony at a regularly scheduled

Congressional hearing pursuant to a written request for such presentation made by the Chairman or Ranking Minority Member of the Committee or Subcommittee conducting such hearing.

     . . . .

48 C.F.R. § 31.205-22(b)(1).  The pertinent regulations further provide:

(d) Contractors shall maintain adequate records to demonstrate that the certification of costs as being allowable or unallowable (*see* 42.703-2) pursuant to this subsection complies with the requirements of this subsection.

(e) Existing procedures should be utilized to resolve in advance any significant questions or disagreements concerning the interpretation or application of this subsection.

48 C.F.R. § 31.205-22(d) & (e).   The plaintiffs summarily assert that "DESE did not submit costs for attempts to influence elections or legislation and the Hackett Reports do not describe activities that were 'in preparation for an effort to engage in unallowable activities.'"  (Doc. 89, p. 13).

### 1. Byrd Amendment

The plaintiffs then argue that, even if the activities described in the Hackett Report were in violation of FAR, the Byrd Amendment, 31 U.S.C. § 1352, limits the definition of lobbying to specific contract actions and does not include contacts related to procurement programs or "program lobbying" in its definition of "lobbying."  (Doc. 89, p. 14).  While the Byrd Amendment might refer only to specific contract actions, contrary to what the plaintiffs would have the court conclude, the court does not find that the Byrd Amendment is applicable to the instant case.

The Byrd Amendment, entitled "Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions," states in relevant part:

21

(a)(1) None of the funds appropriated by any Act may be expended by the recipient of a Federal contract, grant, loan, or cooperative agreement to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any Federal action described in paragraph (2) of this subsection.

31 U.S.C. § 1352(a)(1).  The "Federal actions" to which § 1352 is explicitly limited are as

follows:

(a)(2) The prohibition in paragraph (1) of this subsection applies with respect to the following Federal actions:

    (A)    The awarding of any Federal contract.
    (B)    The making of any Federal grant.
    (C)    The making of any Federal loan.
    (D)    The entering into of any cooperative agreement.
    (E)    The extension, continuation, renewal, amendment, or modification
of any Federal contract, grant, loan, or cooperative agreement.

31 U.S.C. § 1352(a)(2).

The Byrd Amendment further provides that "[t]he Director of the Office of Management

and Budget [OMB], after consulting with the Secretary of the Senate and the Clerk of the House

of Representatives, shall issue guidance for agency implementation of, and compliance with, the

requirements of this section."  31 U.S.C. § 1352(b)(6).  Thereafter, on December 20, 1989 (1989

memo), and June 15, 1990 (1990 memo), OMB, Office of Federal Procurement Policy (OFPP),

issued memorandums designed to clarify the application of § 1352.[22]  Plaintiffs ask the court to

read § 1352 and the 1990 OMB memorandum together to eviscerate the FAR's definition of

"lobbying," and even go so far as to say that § 1352 "amends the meaning of FAR Section

31.205-22." (Doc. 89, p. 14).  The court is unpersuaded by this argument.  Nowhere in the FAR

---

[22]The 1989 memo is located at 54 Federal Register 52306, and the 1990 memo is located at 55 Federal Register 24540.

or the OMB memos is there mention of an intention to amend the FAR.  Absent a provision

amending the FAR, the court is disinclined to amend it on its own, and is certainly disinclined to

determine that General Wright acted arbitrarily and capriciously in refusing to read the memos

and the Byrd Amendment in conjunction with the FAR to amend the FAR.

     Neither § 1352 nor the OMB memos define "lobbying."  However, the 1989 memo

explicitly states that "costs that are specifically unallowable under the provision of the FAR are

not made allowable under the requirements in the OMB guidance."  54 Federal Register at

52308.  The OMB memoranda, then, only serve to clarify the limits of § 1352, and do not to

change the definition of "lobbying."

     In his order, General Wright does not undertake any analysis of the Byrd Amendment, the

OMB memos, or their relationship to the FAR.  Instead, he states:

> I have reviewed the Byrd Amendment . . . and the arguments that the lobbying
> activities in question were permissible since they were activities in support of a
> 'program' and not for the specific contract in question.  I have also reviewed the
> assertion that the Office of Federal Procurement Policy (OFPP) Memo of June 14,
> 1990 (55 Federal Register 24540), purports to amend the meaning of the FAR by
> clarifying and extending it to encompass and nullify the Federal Government's
> allowability rules pertaining to lobbying as embodied in FAR 31.205-22.  Based
> on my review of these authorities, I find that the FAR provision remains the
> applicable regulatory guidance for determining lobbying expenses in this case and
> is not superseded by § 1352 or the OFPP Memo.

(General Wright's December 19, 2002 letter terminating the suspension at ¶ 7 ("December 19

letter")).[23]  The court finds that General Wright's explanation is sufficient.  General Wright was

not required to undertake an in-depth analysis of the above-mentioned materials.  Instead, he was

charged with determining whether the plaintiffs submitted unallowable costs to the government

---

[23]General Wright's letter is located at Doc. 89, exhibit B.

and whether the plaintiffs were "presently responsible." He references the OMB memorandum and the Byrd Amendment only by way of explanation that he reviewed them and found them not applicable in this case. Nothing further is required.

### 2. 2 U.S.C. § 1602

The plaintiffs further argue that the activities described in the Hackett Reports were not "lobbying contacts." (Doc. 89, p. 15). The plaintiffs base this argument on 2 U.S.C. § 1602, which excepts from the definition of lobbying communications "made by a public official acting in the public official's capacity" as well as communications "compelled by a federal contract." 2 U.S.C. § 1602(8)(B)(i) and 2 U.S.C. § 1602(8)(I)(x). Although the plaintiffs assert that "ample evidence submitted . . . and contained in the Administrative Record demonstrates clearly that the contacts described in the Hackett Reports were both within the scope of work of the DESE contract with the Army and the scope of the Titan subcontract with DESE, (doc. 89, p. 16), the court disagrees. The abundance of evidence shows that Tiwari directed the communications that are contained in the Hackett Reports, but the plaintiffs have failed to establish that Tiwari was actually authorized to make that direction. The court is sympathetic to the plaintiffs' argument that

> [t]here is no evidence whatsoever in the Hackett Reports that either Wallace Kirkpatrick or Mr. Hackett lobbied for the award of any specific contract for their companies; at all times, they were supporting the KE-AST Program Manager, Mr. Tiwari, and helping the Army obtain its goals relative to the KE-ASAT Program. Clearly, merely providing support to an executive agency – at the direction of a program head – cannot reasonably be described as lobbying.

(Doc. 89, p. 16). However, the task before the court is to determine whether General Wright acted arbitrarily and capriciously, abused his discretion, or acted otherwise not in accordance

with the law when he (1) temporarily suspended the plaintiffs from government contracting, and subsequently, when he (2) refused to terminate the suspension *ab initio*, and not to substitute its judgment for General Wright's judgment.

General Wright found that neither 2 U.S.C. § 1602 nor its definitions apply to a suspension action governed by the FAR, and that, even if it did, "neither Mr. Hackett, nor Mr. Kirkpatrick would fall within the purview of the statute since they are not public officials." (Doc. 89, Ex. B, p. 2). However, the plaintiffs argue that General Wright did not provide an adequate explanation why § 1602 does not apply and that FAR 31.205-22 does not define "lobbying," but the Army has described the activities in the Hackett Reports as "lobbying." (Doc. 89, p. 16). Because § 1602 is Congress's most recent definition of "lobbying," the plaintiffs argue that it should be the operative definition. (Doc. 89, p. 16).

In response, the defendants assert that the plaintiffs' analysis is faulty and must fail. (Doc. 91, p. 26). Specifically, the defendants argue that

> The Lobbying Disclosure Act has no relevance to plaintiffs' suspension actions under the FAR. The Act requires "lobbyists" and "lobbying firms," as those terms are defined in the Act, to register with the Secretary of the Senate and the Clerk of the House, and to file semiannual reports with the Secretary and the Clerk concerning their activities, including estimates of money paid or expended for lobbying activities during the reporting period. Willful noncompliance with the Act is reported to the Department of Justice and noncompliant lobbyists and lobbying firms can be punished with civil fines up to $50,000. Further, the Act's definition of "lobbying contacts" contemplates that such "contacts" would be made by professional lobbyists and groups on behalf of their "clients," hence the need for registration and monitoring under the Act.

> The scope, intent, and provisions of the Act, as shown, are wholly unrelated to the FAR and the plaintiffs' suspension actions under the FAR. Plaintiffs and their subcontractors were never required under the DESE contract to serve as a "lobbyist" or "lobbying firm" as discussed under the Act. They were never subject to the registration and reporting requirements under the Act. The

Act clearly indicates that the definitions cited by plaintiffs as controlling over the FAR are definitions which only control the Act itself. 2 U.S.C. § 1602. Defendants assert that DESE was never subject to the Act in the first place and cannot reasonably rely upon the Act now to bolster its argument that its lobbying and billing activities are not governed by the FAR.

(Doc. 91, pp. 26-27). Further, the defendants argue, that the definition of "lobbying" in the FAR was provided for by the OMB in 1984. The defendants refer to a Federal Acquisition Circular put out April 27, 1984, which amended the FAR "with respect to the lobbying cost principle in the FAR subpart that covers contract cost principles in contracts with commercial organizations" in a manner consistent with the OMB circular A-122. (*Id.* at pp. 23-25). Therefore, the lobbying cost principle in A-122 was edited to conform to the FAR format and the cost principle in FAR 31.205-22 was edited to define "unallowable lobbying cost activity" consistent with the OMB circular. 49 Federal Register 18278. (See DEX 9).

Although the plaintiffs argue that the FAR does not define "lobbying," FAR 31.205-22 is entitled "Lobbying and political activity costs." 48 C.F.R. § 31.205-22. The only reasonable inference one could draw is that the costs not allowed by that provision are "lobbying and political activity costs." 48 C.F.R. § 31.205.22(a). Because the Federal Acquisition circular makes it clear that the definition of "lobbying costs" in the FAR is the definition that applies to contract cost principles in contracts with commercial organizations, the court finds that it is the definition applicable to the instant case.

### 3.   Constructive Change Doctrine

The plaintiffs next complain that General Wright never considered whether FAR 31.205-

22 was subject to the constructive change doctrine.[24]  (Doc. 89, p. 17).  As the plaintiffs point

out,

> the constructive change doctrine is made up of two elements – the "change" element and the "order" element.  To find the change element we must examine the actual performance to see whether it went beyond the minimum standards demanded by the terms of the contract.  But, this is not the end of the matter.
>
> The "order" element is also a necessary ingredient in the constructive change concept.  To be compensable under the changes clause, the change must be one that the government ordered the contractor to make.  The Government's representative, by his words or deeds, must require the contractor to perform work which is not a necessary part of his contract.  This is something which differs from opinions, advice, comments, suggestions, or opinions which Government engineering or technical personnel frequently offer to a contractor's employees.

(Doc. 89, p. 18 (citing *In re Indus. Research Assocs., Inc.*, 68-1 BCA ¶ 7,069 32,679, 32,685-

86)).  The plaintiffs argue, therefore, that because the lobbying activities in the Hackett Reports

were not required in DESE's contract, they have clearly satisfied the 'change' element.  (Doc. 89,

p. 18).  Further, they argue, because Tiwari ordered the activities that caused the suspension, the

'order' element is also met.[25]  (*Id.*).

The defendants retort that the constructive change doctrine is inapplicable to this case

because Mr. Tiwari had no actual, apparent, or implied actual authority to contract.  In support of

their argument, the defendants cite a Court of Federal Claims case that held:

---

[24]In his December 19, 2002 letter, General Wright wrote that he "had reviewed the doctrines of 'constructive change' and 'apparent authority' and [found] that neither applies in this case."  While the plaintiffs complain that he provided no analysis as to how he arrived at that conclusion, the court is not convinced that he was obligated to provide anything more than he did.

[25]The plaintiffs point out that Mark Lumer, the Contracting Executive at SMDC testified that if a senior government official such as Mr. Tiwari directed the plaintiffs to undertake the tasks described in the Hackett Reports, then the constructive change doctrine might have rendered allowable the costs that the Army has claimed were unallowable.  If this case were before the court on a typical motion for summary judgment rather than a review of an administrative order, Mr. Lumer's testimony might find more weight.  However, as stated throughout this opinion, this court's function is to determine whether General Wright acted arbitrarily and capriciously in his rulings of December 19, 2002 and January 16, 2003, not to re-weigh the evidence and substitute this court's judgment for General Wright's.

As a threshold matter, to succeed on a constructive change claim, a contractor must demonstrate that it notified the Government that it perceived a given order as a change of the contract's terms and that the person who ordered the change possessed the requisite authority.  As a substantive matter, the contractor also must prove that the putative change is actually a change in the terms of the agreement . . . .

Section I of the contract incorporates the Notification of Changes Clause, FAR § 52.243.7 (Apr. 1984).  Within 10 days of any government action . . . considered to be a contract change, [the contractor] is required to provide written notice to the contracting officer of

> (1) The date, nature, and circumstances of the conduct regarded as a change;

> (2) The name, function, and activity of each Government individual and Contractor official or employee involved in or knowledgeable about such conduct;

> (3) The identification of any documents and the substance of any oral communication involved in such conduct;

> (4) In the instance of alleged acceleration of scheduled performance or delivery, the basis upon which it arose;

> (5) The particular elements of contract performance for which the Contractor may seek an equitable adjustment under this clause, including - -

>> (i) What contract line items have been or many [sic] have been affected by the alleged change;

>> (ii) What labor or materials or both have been or may be added, deleted, or wasted by the alleged change;

>> (iii) To the extent practicable, what delay and disruption in the manner and sequence of performance and effect on continued performance have been or may be caused by the alleged change;

>> (iv) What adjustments to the contract price,

28

> delivery schedule, and other provisions affected by
> the alleged change are estimated; and

> (6) The Contractor's estimate of the time by which the
> Government must respond to the Contractor's notice to minimize
> cost, delay or disruption of performance.

*Northrop Grummon Corp. v. United States*, 47 Fed. Cl. 20, 129-130 (2000). Although the DESE

contract does not incorporate FAR § 52.243-7, it does incorporate FAR § 52.243-2, Alternate II,

which provides:

> (a) The Contracting Officer may at any time, by written order, and without notice
> to the sureties, if any, make changes within the general scope of this contract in
> any one or more of the following:

> (1) Description of services to be performed.

> (2) Time of performance (i.e., hours of the day, days of the week,
> etc.).

> (3) Place of performance of the services.

> (4) Drawings, designs, or specifications when the supplies to be
> furnished are to be specially manufactured . . . .

> (5) Method of shipment . . . .

> (6) Place of delivery.

> (b) If any such change causes an increase or decrease in the estimated cost of, or
> the time required for, performance of any part of the work under this contract,
> whether or not changed by the order, or otherwise affects any other terms and
> conditions of this contract, the Contracting Officer shall make an equitable
> adjustment in the (1) estimated cost, delivery or completion schedule, or both;
> (amount of any fixed fee; and (3) other affected terms shall modify the contract
> accordingly.

> (c) The Contractor must assert its right to an adjustment under this clause within
> 30 days from the date of receipt of the written order.  However, if the Contracting
> Officer decides that the facts justify it, the Contracting Officer may receive and
> act upon a proposal submitted before final payment of the contract.

(d) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

(e) Notwithstanding the terms and conditions of paragraphs (a) and (b) above, the estimated cost of this contract and, if this contract is incrementally funded, the funds allotted for the performance of this contract, shall not be increased or considered to be increased except by specific written modification of the contract indicating the new contract estimated cost and, if this contract is incrementally funded, the new amount allotted to the contract. Until this modification is made, the Contractor shall not be obligated to continue performance or incur costs beyond the point established in the Limitation of Cost or Limitation of Funds clause of this contract.

Reading these two FAR provisions in the context of the "constructive change" doctrine makes it clear that the doctrine is wholly inapplicable to the circumstances in the instant case. The court does not find, and the plaintiffs have not presented any law to persuade the court, that the constructive change doctrine operates to rectify an otherwise unallowable billing. Instead, the constructive change doctrine seems to be an equitable remedy given to contractors that perform functions outside of their contract scope of work and incur additional expenses as a result of the additional work.[26]

_____

[26]The defendants argue that the constructive change doctrine is inapplicable because Mr. Tiwari had no actual, apparent or implied authority to bind the government. (Doc. 91, pp. 29-33). At the outset, no evidence exists that the plaintiffs supplied the government written notice of any perceived change. *See Northrop Grumman Corp. v. United States*, 47 Fed. CL. 20, 131-132 (2000), *citing Calfon Constr. Inc. v. United States*, 18 Cl. Ct. 426, 438 (1989), and, even if it did, Mr. Tiwari did not possess the requisite authority to order a change.

In fact, under the case law, not even the contracting officer is "authorized to bind the government by actions which are prohibited or exceed limits prescribed by statutes and by regulations published in the Federal Register and/or Code of Federal Regulation." *Federal Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S. Ct. 1, 92 L. Ed. 10 (1947); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Because the activities described in the Hackett Reports could have violated FAR § 31.205-22, Mr. Tiwari would have been without authority to bind the government by those potentially prohibited activities. Therefore, General Wright's finding that the constructive change doctrine was not applicable in the instant case is correct.

The defendants further point out that the Government cannot be bound by the apparent authority of its agents. *See Roy v. United States*, 38 Fed. Cl. 184, 187 (1997). The Federal Claims Court dealt with the issue of implied authority as it relates to Program Manager like Mr. Tiwari:

Further, implied actual authority may not inhere in a government employee when regulations preclude that employee from exercising contracting authority. *See Roy v. United States*, 38 Fed. Cl. 184, 189-91 (citation omitted), *dismissed by* 124 F.3d 224 (Fed. Cir. 1997). Government program managers are precluded from

### D. False Claims Act

The plaintiffs next argue that, although they asked General Wright to do so, he never reconsidered his original conclusion that the plaintiffs violated the False Claims Act. (Doc. 89, pp. 7, 20-21). In his Notice of Suspension, General Wright concluded that "DESE and Mr. Kirkpatrick submitted claims for these unallowable costs in violation of 18 U.S.C. 287 [False Claims Act] and FAR section 31.205-22(a)." (PEX 1 at p. 1). The plaintiffs point out that General Wright made a legal conclusion that the plaintiffs violated a criminal statute in the absence of a criminal conviction. (Doc. 89, p. 20). On this issue, the plaintiffs argue that:

> In order for General Wright to conclude that Plaintiffs violated the False Claims Act, he was required to find that Plaintiffs knowingly and willfully submitted claims which were false, fictitious, or fraudulent. Even if the costs the Army contended were unallowable constituted false, fictitious, or fraudulent claims, the Army was required to find that the costs were submitted *intentionally with knowledge of their falsity*.
>
> None of General Wright's official statements, from the original suspension to the January 16, 2003 letter rejecting Plaintiffs' final request for reconsideration, contain any analysis as to why Plaintiffs' activities (and which activities) implicated or constituted violations of the False Claims Act. . . . Plaintiffs are at a

───────────────

directing additional work.

> (a) Only contracting officers acting within the scope of their authority are empowered to execute contract modifications on behalf of the Government. Other Government personnel shall not - -
>
> > (1) Execute contract modifications;
> > (2) Act in such a manner as to cause the contractor to believe that they have authority to bind the Government; or
> > (3) Direct or encourage the contractor to perform work that should be the subject of a contract modification.

F.A.R. § 43.102 (1988).

*Northrop Grumman Corp.*, 47 Fed. Cl. at 133-34.

Because Mr. Tiwari was not a representative of the contracting officer, he had no authority to effectuate a change to the contract. No evidence exists that the contracting officer bestowed that authority on Mr. Tiwari. Therefore, even if the court found that the constructive change doctrine was applicable to the instant case, it would not have found that General Wright's decision not to apply the doctrine to the facts of the instant case was arbitrary and capricious for the alternative reasons set out herein and presented by the defendants.

loss as to how General Wright could possibly have concluded that they intentionally defrauded the government (which is essentially what he has accused Plaintiffs of doing by invoking the False Claims Act) by submitting the costs the Army has deemed "unallowable."

This issue is typical of the Army's actions in this case. General Wright has found Plaintiffs guilty of violating a criminal statute yet has never explained how he reached that conclusion, and has refused to retract his finding, even after he was aware no criminal prosecution or even an indictment would be forthcoming. There is not now and never was any evidence to support application of the False Claims Act to Plaintiffs' activities. General Wright and Ms. Butler admit as much by their failure to reveal why they think the statute applies to Plaintiffs. This Court should issue an order finding that Plaintiffs have not violated the False Claims Act.

(Doc. 89, pp. 20-21) (italics in original).

The court agrees in part with the plaintiffs' assertions. In order to demonstrate a violation

of § 287, it must be shown "(1) the [plaintiffs herein] knowingly made and presented to a

department or agency of the United States a false, fraudulent or fictitious claim against the

United States; and (2) the[y] acted with knowledge that the claim was false, fraudulent or

fictitious." *United States v. Abbott Washroom Systems, Inc.*, 49 F.3d 619, 624 (10th Cir. 1995).

The evidence must further show that the plaintiffs acted wilfully. Eleventh Circuit Pattern Jury

Instructions: Criminal, §11.2 (2003). General Wright's conclusory finding that the plaintiffs

violated a criminal statute, without more, is arbitrary and capricious. Not a shred of evidence

exists in this record that would indicate that the plaintiffs willfully submitted claims that were

false, fictitious, or fraudulent. Even more, nowhere in the record does the Government make the

assertion that the plaintiffs made fraudulent, fictitious, or false claims aside from the conclusory

assertion above.

While the finding that the plaintiffs violated the False Claims Act appears to be arbitrary

32

and capricious given the lack of evidence in the record to support such a claim, that finding alone does not render General Wright's ultimate decision - - to suspend the plaintiffs - - arbitrary and capricious.  However, the court is sympathetic to the plaintiffs' belief that being accused of "intentionally defrauding the government" is not a stigma that one would desire to have attached to their reputation.  As such, the court finds that General Wright's conclusion on this aspect of his decision is without basis and therefore must be removed from the administrative findings. Accordingly, it will be so ordered.

### E. Termination *Ab Initio*

#### 1. Present Responsibility

A government contractor suspected of fraud or criminal activity may be debarred from contracting with the government.  Upon a showing of "adequate evidence," a contractor suspected of wrongdoing may be temporarily suspended from entering new contracts with the government.  Specifically, there must be a showing of "adequate evidence" of the commission of fraudulent activity or a criminal offense in connection with the performance of the contract.  48 C.F.R. §§ 9.407-1(a) & (b) & 9.407-2(a)(1).  A contractor may also be suspended if there is "adequate evidence" of conduct "that affects the present responsibility of a Government contractor or subcontractor."[27]  48 C.F.R. § 9.407-2(c).  The regulations further provide:

---

[27] The regulations regarding what is a responsible contractor provide, in pertinent part:

To be determined responsible, a prospective contractor must–

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (*see* 9.104-3(a));
(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
(c) Have a satisfactory performance record (*see* 48 C.F.R. § 9.104-3(b) and part 42, subpart 42.15). A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104-2;
(d) Have a satisfactory record of integrity and business ethics;

33

. . . . The existence of a cause for suspension does not necessarily require that the contractor be suspended.  The suspending official should consider the seriousness of the contractor's acts or omissions and may, but is not required to, consider remedial measures or mitigating factors, such as those set forth in 9.406-1(a).  A contractor has the burden of promptly presenting to the suspending official evidence of remedial measures or mitigating factors when it has reason to know that a cause for suspension exists.  The existence or nonexistence of any remedial measures or mitigating factors is not necessarily determinative of a contractor's present responsibility.

48 C.F.R. § 9.407-1(b)(2).

Under the facts presented at the time of this court's earlier memorandum opinion, the court did not find that General Wright's decision to temporarily suspend the plaintiffs was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.  The standard of adequate evidence that General Wright applied is an extremely low standard of proof.  This court could not conclude as a matter of law at that juncture whether a violation had occurred or whether the plaintiffs were "presently responsible."  Instead, the court found that the interests of the parties were best served by remanding this matter to General Wright so that he would have the opportunity to review the record as it existed after the court allowed additional discovery and supplementation to determine whether the plaintiffs were presently responsible to continue in government contracting.  (Doc. 85 at ¶ 7).

While, initially, the plaintiffs argued that General Wright's decision to suspend them

---

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (*see* 9.104-3(a));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (*see* 9.104-3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

48 C.F.R. § 9.104-1.

from government contracting should have been terminated, now that General Wright has

terminated the suspension, the plaintiffs argue that the termination of the suspension should have

been *ab initio*.  (Doc. 89, p. 21).  The plaintiffs state:

> General Wright now states that the need to suspend Plaintiffs was not
> alleviated until they presented him with evidence of remedial measures in October
> 2002 aimed at preventing similar disputes.[28]  Curiously, none of General Wright's
> statements of record contain any comments on the evidence contained in the
> original administrative record which indicated that DESE had always been, if
> anything, hyper-conscientious in its billings to the government or the mountain of
> evidence that suggested DESE was, at the time of the suspensions, and always had
> been, 'presently responsible.'

(Doc. 89, pp. 21-22).  In fact, the plaintiffs argue that General Wright did not even mention

"present responsibility" in any of his findings until his January 16, 2003 letter denying the

---

[28]The evidence of remedial measures aimed at preventing similar disputes to which the plaintiffs refer is the DESE
Research, Inc. Lobbying and Political Activity Policy.  The policy, which is located at PEX 156, states:

1.0 PURPOSE

The purpose of this policy is to provide corporate guidelines on the procedures to be followed when making any
communication with any federal, state, or local legislative body.

2.0 REFERENCE

FAR 31.205-22, Lobbying and Political Activity Costs

3.0 POLICY

DESE policy prohibits billing lobbying or political activity costs that are designed to influence any federal, state, or
local election, referendum, initiative, or similar procedure through in kind , or cash contributions, endorsements,
publicity, or similar activities except as authorized below.  DESE also considers costs associated with establishing,
administrating, contributing to, or paying expenses of a political party, campaign, political action committee, or other
organization for the purpose of influencing the outcome of an election, referendum, initiative, or similar procedure as
unallowable costs.

FAR 31.205-22 outlines the types of activities that are prohibited.  This document also provides a list of activities that
are excepted from this regulation.  Prior to participating in any activity, prohibited or excepted, DESE employees will
obtain written **advanced** approval from the Government Contracting Officer pursuant to FAR 31.205-22.  Requests for
approval must be submitted through supervisory channels.  **No activity will begin until written approval is received
from the Contracting Officer.**  If an employee is, through no fault of their own, placed in a position that could fall
under the purview of this regulation, the employee will immediately excuse themselves from the meeting and report the
incident through their immediate supervisor who shall forward the report to the Contracting Officer in writing.

No cost shall be billed unless Advance Agreement has been reached with the cognizant Contracting Officer or has been
otherwise authorized by the cognizant Contracting Officer in writing.

plaintiff's request that he terminate the suspension *ab initio*. (Doc. 89, p. 22). In that letter, General Wright stated that he "determined immediate action was necessary to protect the Government's interests because [he] deemed [the plaintiffs] not to be presently responsible."

The plaintiffs argue that General Wright's failure to consider their present responsibility or the existence of numerous mitigating factors renders his decision to suspend them arbitrary. In support of their position, the plaintiffs rely on *Silverman v. United States Department of Defense*, 817 F. Supp. 846, 849-50 (S.D. Cal. 1993), for the proposition that the an agency debarment decision was arbitrary, capricious, and an abuse of discretion because it did not focus on mitigating factors surrounding the plaintiff's guilty plea, the length of time that had passed since the statement that supported the plaintiff's conviction, and the contractor's conduct in the interim. The plaintiffs contend that the instant case is similar because:

> . . . General Wright's suspension of Plaintiffs came years after the activities which serve as the basis for the suspension. Unlike Mr. Silverman, Plaintiffs were never prosecuted for a violation of any federal statute, much less convicted of a crime. It is undisputed that, at the time Plaintiffs were suspended, they were not submitting any unallowable costs for payment – any conceivably questionable billing practices were part of history. Indeed, as General Wright noted, DESE had a 'past record of trustworthiness and reliability.' Ex. B.

> There should never have been any question about Plaintiffs' integrity. General Wright testified that he felt his decision did not call into question Wallace Kirkpatrick's integrity.[29] Wright Depo. at 68-70. During the time DESE was under investigation, it received and was nominated for business ethics awards: in March 2001 DESE was awarded the American Business Ethics Award by the North Alabama Society of Financial Service Professionals; in November 2000 DESE was nominated for the Better Business Bureau of North Alabama's Torch Award for Marketplace Ethics; and DESE has been nominated three times for

---

[29]In a footnote, the plaintiffs state that "General Wright's decision that Plaintiffs should be suspended when he had no concerns about their integrity is, to say the least, puzzling." (Doc. 89, p. 24, n. 15). However, the court disagrees with that statement. General Wright's concern seems to have been that the plaintiffs did not believe costs such as those submitted in the Hackett Reports were unallowable, and therefore, he feared that the plaintiffs would continue to submit like costs because they did not realize that they were unallowable costs.

Huntsville/ Madison Chamber of Commerce Small Business of the Year, most recently in June 2001. *See* PEX 28.

Aside from the actions which serve as the basis of General Wright's suspension action, Plaintiffs have never had any question raised regarding any aspect of their business ethics. Failure to give serious weight to this fact, standing alone, made the decision to suspend Plaintiffs arbitrary.

(Doc. 89, pp. 23-24).

The defendants argue that the *Silverman* case is inapplicable to the instant case for several

reasons. Specifically, the defendants state:

. . . . First, in the present case, plaintiffs' received a fact-based suspension (not debarment) during which time the Government continued to award contracts to plaintiffs only as a result of the court-ordered temporary restraining order and preliminary injunctive relief, enjoining the army from enforcing its suspension. Second, in contrast with debarment cases, suspensions do not require the suspending official to consider mitigating evidence, although General Wright in this case did so when he terminated the suspension. Third, at the time of the initial suspension decision, General Wright focused on plaintiffs' lack of present responsibility, as discussed below, while the court in *Silverman* determined that the agency did not. Finally, Mr. Silverman admitted to a violation of the law while plaintiffs in this case continue to deny that any FAR violation ever occurred.

(Doc. 91, p. 34).

*Silverman*, as the defendants point out, is a debarment case. As the plaintiffs correctly

note, the *Silverman* court found that the DOD did not focus on Silverman's present

responsibility, that the decision to debar came six years after the activity that supported

Silverman's misdemeanor conviction, and, during the six years between the activity and the

debarment, the government continued to award contracts to Silverman's company. Additionally,

the government failed in that case to consider Silverman's efforts to mitigate. Finding that the

DOD's suspension of Silverman was arbitrary, capricious, and an abuse of discretion, the court

entered summary judgment for Silverman. The court notes, however, that the remedy Silverman

received was termination of the debarment.  The debarment was not terminated *ab initio*.  It was

simply terminated.  *Silverman*, 817 F. Supp. at 850.

Even if this court were to determine that General Wright did not adequately address

whether the plaintiffs were presently responsible to contract at the time that he issued the

suspension, following suit with the *Silverman* court, this court's action would be to terminate the

suspension.  This General Wright has already done.  Therefore, the court finds that *Silverman*

does not afford the plaintiffs any more relief than they have already received.

The plaintiffs next argue that no immediate need to protect the government existed so as

to necessitate General Wright's decision to suspend them and that the suspension can only be

interpreted as "capricious punishment."  (Doc. 89, pp. 24-26).  In support thereof, the plaintiffs

state that "suspensions are only justified when there is a 'real need for immediate action to

protect the public interest.'" *Sloan v. Dep't. of Hous. & Urban Dev.*, 231 F.3d 10, 17 (D.C. Cir.

2000).  (Doc. 89, p. 24).  The plaintiffs also cite FAR § 9.407-1(b)(1), which provides that

"[s]uspension is a serious action to be imposed on the basis of adequate evidence, pending the

completion of investigation or legal proceedings, when it has been determined that immediate

action is necessary to protect the government's interest."  Additionally, the plaintiffs add, "as a

matter of public policy, an agency may impose suspension only in the public interest for the

Government's protection and not for the purposes of punishment." *Lion Raisins, Inc. v. United

States*, 51 Fed. Cl. 238, 247 (2001) (quoting FAR § 9.402(b)).  (Doc. 89, pp. 24-25).

In support of their argument that no immediate need to suspend them existed, the

plaintiffs offer the following:

The Contract was awarded in 1997 and the activities in the Hackett Reports

occurred from August 1997 until September 1999.  The audit which raised concerns occurred in 1999 and the case was referred to the Army's criminal division that year.  During and after that time, DESE continued to be an active government contractor and received additional contracts.  In the summer of 2001, the Procurement Fraud Division instituted its suspension and debarment proceedings.  Finally, in November 2001, four years after the award of the Contract and a full two years after the audit which gave rise to this case, General Wright suspended Plaintiffs.  Both before and after this case, DESE has never been accused of any other wrongdoing in its contracting activities on behalf of the government.  Clearly, the temporal distance between the suspension decision and the events giving rise to the suspension, the lack of a single comparable offense by Plaintiffs, and Plaintiffs' otherwise sparkling contracting record should have indicated to General Wright that public fisc was not imminently threatened by continued government contracting with Plaintiffs.

As it is, there is no evidence that either General Wright or Ms. Butler, who recommended Plaintiffs' suspension to General Wright, ever engaged in any such analysis.  Neither Ms. Butler's memorandum recommending suspension nor General Wright's November 15, 2001 suspension decision refer to any immediate need to suspend Plaintiffs.  General Wright's failure to provide a single compelling reason requiring Plaintiffs' suspension, in and of itself, renders his suspension of Plaintiffs arbitrary and capricious.

(Doc. 89, pp. 24-25).

In response, the defendants retort that General Wright made his concern regarding the immediate need to protect the government clear at his deposition.  Specifically, General Wright testified that:

> [I]n order to protect the Government because of the fact that DESE research is involved in many governmental contracts, and because it appeared that by the submissions that [plaintiffs] had submitted that [they] agreed that these incidences had occurred, so it was not a question of fact as to whether or not they had occurred, but it was a question of interpretation as to whether or not they amounted to lobbying which would be unallowable costs.
>
> * * * * *
>
> Nevertheless, still looked to me like these were ongoing things, they had occurred over time, that there had been involvement by the officials from DESE Research, Incorporated, and that in order to protect the Government it was necessary to suspend it because - - suspend that organization and the officials involved. . . .

39

* * * * *

> [A]s I understood it [DESE] [was] involved in several other government contracts[,] which is the reason I suspended them. Because if the Government needs protection . . . from a contractor who is billing costs that are unallowable, that's what my job is to do.

(General Wright's January 30, 2002 Dep., pp. 19, 29, 70).

The defendants also disagree with the plaintiffs' portrayal of time. Whereas the plaintiffs state that audit occurred in 1999 and the decision to suspend the plaintiffs was not issued until two years later, the defendants explain that the Army's Criminal Investigative Division (CID), the U.S. Attorney's Office in Birmingham, Alabama, and the Army's Procurement Fraud Division (PFD) were investigating the plaintiffs between October 1999 and May 2001, when PFD sent the first show cause notice to the plaintiffs. Further, the defendants add, this span of time had no minimizing effect on General Wright's immediate concerns to protect the Government by suspending the plaintiffs.

Next, the plaintiffs argue that General Wright had, and this court now has, the authority to terminate the suspensions *ab initio* and that termination *ab initio* is the only remedy that could restore their reputations. (Doc. 89, p. 27-28). In support of their argument, the plaintiffs cite several cases which they maintain warrant that this court overturn General Wright's suspension decision *ab initio*. A review of those cases is appropriate at this juncture.

In *Sloan*, 231 F.3d 10, two contractors sought review of HUD's refusal to void their suspensions *ab initio*. The contractors were suspended based upon a HUD auditor's allegation that they failed to properly perform lead-based paint abatement. 231 F.3d at 13. Thereafter, the contractors were notified that they were suspended from all HUD related contracting work and

that HUD was seeking a five year debarment from participation in HUD-related contracting

work. *Id*. at 14.  The suspension notice set forth that HUD had information "'indicating serious

irregularities in [J&L's] business dealings with the Government,' namely: (1) improper cleanup

of waste from the lead-based paint abatement process; (2) improper disposal of construction

debris from the demolition; and (3) failure to adhere to contract requirements or HUD Guidelines

by allowing hazardous waste to be tracked outside of containment and allowing workers to

perform abatement work without proper notification." *Id*.  After an administrative hearing,

noting that "'there was not a lead hazard present at [the site] that would have made leadbased

paint abatement protocols necessary[,]'"the ALJ rejected the Government's case seeking

debarment and terminated the suspensions.  However, the ALJ refused to terminate the

suspensions *ab initio* based on an erroneous finding that the contract required the contractors to

operate as though hazardous levels of lead were present at the site.  *Id*.  The contractors appealed

the ALJ's decision to the HUD secretary.  When they were unsuccessful there, the contractors

filed suit in the District Court.  The District Court subsequently dismissed the complaint and the

contractors appealed to the Court of Appeals for the District of Columbia Circuit.

   In its opinion, the Court of Appeals took a close look at suspension and debarment

actions.  Specifically, it noted that:

> Under the applicable regulations, debarment and suspension are
> discretionary measures taken to protect the public interest and to promote an
> agency's policy of "conducting business only with responsible persons."  24
> C.F.R. § 24.115(a) (1995).  The issuance of a suspension is a "serious action,"
> hence it "may be imposed only when: (1) there exists adequate evidence of one or
> more of the causes set out in § 24.405, and (2) immediate action is necessary to
> protect the public interest."  § 24.400(b) (1995); *see also* 24 C.F.R. § 24.405
> (1995). . . .

The parties agree that judicial review of the Secretary's final decision in this case is available pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 704, 706 (1994). Appellants contend that the agency's refusal to void their suspensions *ab initio* was arbitrary and capricious and thus violated § 706(2)(A) of the APA . . . .

Neither party contests the applicability of the APA's arbitrary and capricious standard. Appellee urges, nonetheless, that our review of HUD's decision in the instant case should be "highly deferential," and 'presume the validity of agency action." (Citation omitted). It is well-established that, when conducting review under the "arbitrary and capricious" standard, a court may not substitute its judgment for that of agency officials; rather, our inquiry is focused on whether "the agency [ ] examined the relevant data and articulated a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962)). Our deference to agency decisionmaking does not require us, however, to countenance an agency's failure to "consider[ ] . . . relevant factors" or "clear errors of judgment." *Id.* (Quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285, 42 L. Ed. 2d 447, 95 S. Ct. 438 (1974)).

On the basis of the record before us, we find that HUD's decision not to void the suspensions *ab initio* cannot withstand review, because the decision cannot be squared with the applicable regulations and also, because the decisions of the ALJ and the Secretary fail to "articulate a satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168).

Under the applicable regulations, a suspension is justified *only* when there is "adequate evidence" of wrongdoing and "immediate action is necessary to protect the public interest." 24 C.F.R. § 24.400(b). "In assessing the adequacy of the evidence, the agency should consider how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result." 24 C.F.R. § 24.400(c) (1995). Moreover, the agency's assessment should include an examination of basic documents such as grants, cooperative agreements, loan authorizations, and contracts." *Id.* In applying these regulations, the ALJ and the Secretary are required to consider both whether there is adequate justification for the suspensions at the time they are issued, and whether, in light of the evidence adduced at the debarment hearing, there is good reason to terminate the

suspensions. *See* 24 C.F.R. §§ 24.313, 24.314 (1995).

Many years ago, in *Horne Brothers, Inc. v. Laird*, 150 U.S. App. D.C. 177, 463 F.2d 1268 (D.C. Cir. 1972), Judge Leventhal had occasion to construe what it means for an agency to have "adequate evidence" to justify the "suspension" of a government contractor:

> The "adequate evidence" showing need not be the kind necessary for a successful criminal prosecution or a formal debarment. The matter may be likened to the probable cause necessary for an arrest, a search warrant, or a preliminary hearing. This is less than must be shown at the trial, but it must be more than uncorroborated suspicion or accusation.

463 F.2d at 1271. Obviously, as Horne Brothers suggests, "[a] question of judgment is involved" in any agency decision to issue a suspension. *Id.* What is noteworthy here, however, is that, under the controlling regulations, there can be no suspension without "adequate evidence," the necessity of "immediate action . . . to protect the public interest," "an examination of basic documents," and a determination, based on "all available evidence," that reasonable inferences of wrongdoing can be drawn. 24 C.F.R. §§ 24.410 (1995).

*Sloan*, 231 F.3d at 14-16.

After the hearing before the ALJ, the only claim remaining was that the contractors had improperly disposed of construction debris from the demolition.[30] Rather than argue that the sole remaining charge was the basis for the suspensions, HUD argued that the decision not to void the suspensions *ab initio* should be upheld because the ALJ found that the contractors were to blame for the misunderstandings leading to the faulty audit and resulting sanctions.

In deciding that the suspensions should be voided *ab initio*, the Court of Appeals noted that "[t]he suggestion that appellants should bear the onus of HUD's poor investigatory work is ridiculous. Had HUD officials been more precise in their investigation, that would have

---

[30] At the hearing, the Government withdrew its third ground for debarment - - that the plaintiffs failed to adhere to contract requirements or HUD Guidelines - - because it had no concrete basis to justify the charge, and the ALJ dismissed the first charge - - improper cleanup of waste from the lead-based paint abatement process - - because he found no basis for such charge in the record. 231 F.3d at 16.

discovered that the . . . test[s] clearly established that there were no hazardous levels of lead present at the [site].  The auditor had only to examine the test results or request assistance with their interpretation."  *Sloan*, 231 F.3d at 17.  The court further held that:

> Whatever agency officials may have thought about the case against the appellants when the suspensions were issued, their view of the case should have changed rather dramatically following the hearing before the ALJ.  The hearing made it clear that the initial finding of probable cause was flimsy at best, riding on the heels of a hastily-conducted and technically-flawed audit.  In other words, even if HUD officials thought they had more than "uncorroborated suspicion or accusation" at the time when the suspensions were issued, it was abundantly clear at the conclusion of the hearing that there had been no basis at the outset to suspend appellants.  It was therefore arbitrary and capricious for the agency to deny full relief to appellants.

> . . .

> In this case, appellants' claim for relief was sufficiently compelling that the Secretary granted review specifically to consider the following question: "Under what circumstances is it appropriate for the Secretarial designee to void a suspension *ab initio* when, in hindsight, it is clear that the Respondents are not guilty of the charges that led to the suspension?  (Citation omitted). . . .

> It is clear that there was no need for "immediate action" to be taken against appellants.  *See* 24 C.F.R. § 24.400(b)(2).  The Secretary's decision does not suggest that appellants should have been suspended for the allegations that prompted the first and third charges.  And the Secretary acknowledges that appellants' alleged improper activity in connection with the second charge - - placing debris in an unapproved landfill  - - had ceased before the issuance of the suspensions.  In other words, the Secretary could not find that there was adequate evidence that appellants lacked "present responsibility" when the suspensions were issued.  Nonetheless, the Secretary's decision suggests that appellants' "past irresponsible acts" . . . justified the suspensions.  (Citation omitted).  This is a specious conclusion.  First, the Secretary's decision simply ignores the requirement that there must be a real need for immediate action to protect the public interest in order to justify a suspension.  Furthermore, as noted above, the Government does not contend that the second charge against appellants, without more, could have warranted suspensions, so the Secretary's reason for refusing to void the suspensions *ab initio* makes no sense.

> The Secretary's decision is at best a half-hearted attempt to address

appellants' claim for relief.  And, as is true with portions of the ALJ's decision, the Secretary's decision seems to blame the appellants for the blunders committed by agency investigators.  In short, the decision fails to "articulate a satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made.'"  *State Farm*, 463 U.S. at 43. (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168).  Accordingly, we find the agency's action to be arbitrary and capricious.

*Sloan*, 231 F.3d at 20-22.  The instant case is readily distinguishable from *Sloan*.

The plaintiffs point out that the decision to suspend the *Sloan* plaintiffs was arbitrary and capricious because the ALJ and Secretary failed to "articulate a satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made."  Therefore, the plaintiffs assert, "[t]he court held that it was arbitrary and capricious to deny the contractors' avoidance of the suspensions *ab initio* once HUD's reasons for suspending them proved groundless."  (Doc. 89, p. 28).  However, in the instant case, neither General Wright nor the court have found that the underlying reasons for the plaintiffs' suspension, the violation of FAR 31.205-22, are groundless.  To the contrary, as stated previously, this court cannot find that General Wright's determination is wrong.

Additionally, *Sloan* arose out of a debarment proceeding.  The court of appeals voided the suspensions *ab initio* because of a clear lack of adequate evidence underlying the original suspension action - - finding that the charges underlying the suspension action were "completely unsupportable," "could not be squared with the [agency's] applicable regulations," and "failed to articulate a satisfactory explanation for [the agency's] action including a rational connection between the facts found and the choice made;" in addition to being "devoid of any good reason," and "flimsy at best."  *Sloan*, 231 F.3d at 16-18.  On the other hand, General Wright's decision to suspend the plaintiffs was based upon costs that the plaintiffs admittedly billed and that General

45

Wright found to have violated FAR 31.205-22.

The defendants argue that:

> [w]hen viewing the facts in the instant case through the *Sloan* prism, it becomes evident that General Wright's decision to suspend meets all of the criteria the court in *Sloan* articulated for this court to validate General Wright's decisions under APA review. Since General Wright's decision to suspend was based upon "adequate evidence;" because he "examined the relevant data and articulated [a] satisfactory explanation for [his] action including [a] rational connection between [the] facts found and [the] choice made;" because his decision can be "squared with the applicable [FAR] regulations;" because he found there was "adequate evidence that plaintiffs lacked present responsibility when the suspensions were issued;" and because he determined there existed a "real need for immediate action to protect the public interest in order to justify a suspension," this Court must affirm the Army's decisions in this case.

(Doc. 91, pp. 39-40). The court agrees that *Sloan* does not provide a basis to grant the plaintiffs' requested additional relief. While General Wright might not have articulated the basis for his decision as fully or completely as the plaintiffs, or this court, might have liked, his basis was not the result of a faulty audit or a mistaken contractual interpretation.

The plaintiffs next argue that *Dantran, Inc. v. United States Dept. of Labor*, 171 F.3d 58 (1st Cir. 1999), provides a basis for this court to void the suspensions *ab initio*. (Doc. 89, p. 29). Specifically, the plaintiffs state that the *Dantran* court

> found debarment precluded because the contractor had a reasonable, good faith belief that its practices were consistent with the Act. The court found that there were no aggravating factors and that the violation was either minor or inadvertent and that debarment would be a "harsh" penalty wholly disproportionate to the offense. *Id*. at 74-75. The court stated that, ". . . an employer who violated an unambiguous regulation without more cannot justify debarment' and 'there must be affirmative evidence of culpable conduct." *Id*. at 68-69.

(Doc. 89, p. 29). Naturally, the defendants see *Dantran* quite differently. While noting that *Dantran* is factually distinguishable from the instant case, the defendants offer that *Dantran* is

helpful to the court. The defendants point out that:

> .... In overturning the agency's debarment action for a "serious infirmity," the Court of Appeals in *Dantran* found the agency's rationale for debarment to be "porous" and containing an "obvious inconsistency" between the agency's regulatory basis for debarment and what the regulation actually said, eliminating the need for judicial deference to the agency decision maker. (Citation omitted). Further, the court rejected Dantran's argument that estoppel precluded the government from issuing a debarment since the clear language of the applicable statute in that case precluded Dantran's reliance on a government agent's representation that the regulation provided to the contrary. *Dantran*, 171 F.3d at 67-68. Finally, the court found that the debarment action was "totally out of proportion to the offense." *Dantran*, 171 F.3d at 75.
>
> Defendants agree that a debarment in the present case would similarly have been disproportional to the plaintiffs' offenses given the mitigating circumstances in this case. Accordingly, defendants believe that, unlike *Dantran*, General Wright's decision to suspend was consistent with the regulatory requirements under the FAR, and that his later decision to terminate those suspensions in the face of mitigating evidence, effective December 19, 2002, was not arbitrary.

(Doc. 91, p. 40).

*Dantran* arose out of the Secretary of Labor's investigation into Dantran's practices dealing with employee fringe benefit payments, among other things. In 1989, the Secretary had a compliance officer look into Dantran's payroll practices. The compliance officer found no irregularities in Dantran's practices. Two years later, another compliance officer checked up on Dantran. While Dantran's practices remained the same, the compliance officer's view of their practices was different. He informed Dantran that two of its routine practices violated the McNamara-O'Hara Service Contract Act. In response, Dantran immediately undertook to change their practices to come into compliance. In the meantime, the Secretary froze payments owed to Dantran by the postal service, a move that set into motion the downfall of Dantran. Although Dantran and the Secretary were able to settle the wage related issues, the compliance

officer pushed for debarment because of the "size of the violations and the fact that the firm was

investigated once before." *Dantran*, 171 F.3d at 61.  The Secretary acted upon the Compliance

Officer's request to debar Dantran.  After a hearing before an Administrative Law Judge ("ALJ"),

the ALJ determined that Dantran should not be disbarred.  Specifically, the ALJ found that

Dantran's practices were not in violation of the regulations; and, alternatively, that:

> . . . Dantran had continued the challenged practices in reasonable reliance
> on the results of the Secretary's earlier investigation and that the case therefore
> displayed unusual circumstances sufficient to warrant relief from debarment. *See*
> 41 U.S.C. § 354(a).  These circumstances included, in addition to the fact that the
> plaintiffs had been misled by the Secretary's earlier investigation and by
> statements of various Postal Service employees, three additional facts: (1) Dantran
> had not acted culpably, willfully or deliberately to violate the law; (2) it had an
> excellent history of compliance with the wage and hour laws; and (3) the plaintiffs
> had fully cooperated with the Secretary's inquiry.

*Dantran*, 171 F.3d at 62.  The Secretary then appealed the ALJ's ruling to the ARB and the ARB

reversed the ALJ's decision.

The ARB found that Dantran's practices did violate the applicable regulations and that

Dantran had been culpable in not following the law.  Because Dantran was culpable, the ARB

determined that Dantran should be debarred.  The plaintiffs then sought review of the ARB's

decision from the District Court, which rejected their plea.  Dantran then appealed to the First

Circuit Court of Appeals.

The First Circuit examined Dantran's practice of cross-crediting fringe benefits and its

payment methods alongside the applicable regulations and found that the practice of cross-

crediting was not in violation of the regulation, but that Dantran's payment practices violated a

clearly drafted regulation.  However, the plaintiffs argued that the Secretary should be estopped

from pursuing their debarment because the government was aware of their payment practices.

Because the court was unwilling to "accept a broad rule that prevents the sovereign from enforcing valid laws for no better reason than that a government official has performed his enforcement duties negligently," it rejected the plaintiffs estoppel argument.[31] *Dantran*, 171 F.3d at 66.

Rather than entertain the plaintiffs' estoppel argument, the court chose to "forestall the imposition of [the] debarment sanction" because of "unusual circumstances" under 41 U.S.C. § 354(a) and 29 C.F.R. § 4.188(a). *Dantran*, 171 F.3d at 68. The court went on to say that "the existence of 'unusual circumstances' in a given case depends upon the absence of aggravating factors and the presence of mitigating factors." *Id*. If aggravating factors exist, a government contractor cannot avoid debarment. *Id*. In describing "aggravating factors," the regulations refer to "deliberate" or "willful" conduct, "culpable neglect," and "culpable disregard," thus "evinc[ing] a design to ensure blacklisting of those who have defied the law with a degree of impunity or premeditation." *Id*. What the regulations mean by the term "culpable" is not spelled out except to stipulate that "falsification of records" (an evil not present on this case) qualifies as "culpable failure to comply with recordkeeping requirements." *Id*. "If this latter example is intended to serve as a guide, culpability must require more than simple negligence or a mere failure to ascertain whether one's practices coincide with the law's demands." 171 F.3d at 68.

The ARB found that the plaintiffs' conduct was culpable based upon their practice of cross-crediting and their violation of the frequency of payment regulation. The First Circuit

---

[31]The court went on to say that "if a statute or regulation clearly limits a party's legal obligations, the party cannot justifiably rely for estoppel purposes on a government agent's representation that the law provides to the contrary," and that "[t]his is so because the government speaks most authoritatively through its official policymaking machinery, not through individuals, even if the individuals occupy responsible agency positions. (Citation omitted). Here, even if the plaintiffs relied on [the Compliance officer's] report and/or the statements of postal officials to conclude that their regimen did not violate the frequency of payment requirement, the clear language of the applicable regulation would render such reliance unreasonable." *Dantran*, 171 F.3d at 67-68.

49

rejected the ARB's finding because it determined that the plaintiffs' cross-crediting practice was

allowed under the Act. Therefore, the First Circuit concluded that the ARB's finding of

"aggravation" had to be based on the plaintiffs' violation of the frequency of payment regulation.

However, although the ARB found that the plaintiffs' conduct with regard to the monthly wage

to be culpable because the regulation on point was clear, the court noted that to assume that

debarment necessarily follows the violation of an unambiguous regulation would be unfounded

and would "turn the debarment provision into a strict liability regime." *Dantran*, 171 F.3d at 68.

Specifically, the court reasoned that:

> The regulations speak of "culpable neglect to ascertain" or "culpable
> disregard" of whether one is in violation of the Act as being criteria for finding
> factors in aggravation. To hold that this language renders culpable every violation
> of an unambiguous regulation would, for all practical purposes, turn the
> debarment provision into a strict liability regime. The very invocation of a
> culpability standard, however, is a sure sign that strict liability is not what the
> Secretary intended. This view is explicitly confirmed by the Secretary's
> incorporation into the regulations of a portion of the Act's legislative history
> which states that "[t]he authority [to relieve from blacklisting] was intended to be
> used in situations where the violation was a minor one, or an inadvertent one, or
> one in which disbarment . . . would have been wholly disproportionate to the
> offense." 29 C.F.R. § 4.188(b)(2) (alterations in the original). The ARB's strict
> liability regime drains section 4.188(b)(2) of meaning: after all, a violation of an
> unambiguous regulation can be minor, inadvertent, wholly disproportionate to a
> proposed debarment, or all of the above. Thus, simply stating that an employer
> violated an unambiguous regulation, without more, cannot justify debarment.

*Id.* Although the ARB relied on the portion of section 4.188(b)(1) that excludes "negligent or

willful disregard of the contract requirements and of the Act and regulations, including a

contractor's plea of ignorance of the Act's requirements where the obligation to comply with the

Act is plain from the contract," the court was not convinced that such disregard warranted

debarment. Instead, the court determined that:

50

> [f]airly read, [section 4.188(b)(1)'s] language contemplates an automatic finding of culpability only when the law's requirements are obvious *on the face of the contract*. Under such circumstances, a contractor's disregard of legal requirements legitimately can be considered willful or grossly negligent, and thus manifest the species of culpability delineated by the regulations. Here, however, none of Dantran's contracts with the Postal Service provided notice of the Secretary's interpretation of her frequency of payment rule. The reverse is closer to the truth, for the contracts themselves provided for monthly payments to Dantran and thus appeared to confirm Dantran's historic payroll practices. In this case, then, it is not enough to point to possession of the regulations, and rest. There must be affirmative evidence of culpable conduct.

*Dantran*, 171 F.3d at 69.

Noting that the reviewing court's ordinary course is to remand the case when it finds a "serious infirmity" in the agency's decision, the First Circuit determined that remand would be futile in this case because the record was replete with mitigating circumstances that the ARB overlooked in its review of the case. Specifically, the court found that :

> [t]his solitary item [violation of the frequency of payment provision] cannot trump the numerous indicia of mitigation contained in the record (most of which satisfy precisely the specific mitigating criteria limned by the regulations). Thus, given the absence of aggravating circumstances, the prevalence of mitigating factors, and the relatively insubstantial nature of the violation, debarment would be a punishment totally out of proportion to the offense (and, therefore, contrary to [29 C.F.R. § 4.188(b)(2)].

*Id*. at 74.

*Dantran* is readily distinguishable from the instant case in many ways. Most importantly, *Dantran* is a debarment case. Nowhere in the *Dantran* decision does the court hold that a suspension under the same set of facts would be improper. Further, the code provision at issue in *Dantran* included a culpability standard not present in the instant case. The *Dantran* court relied heavily on that standard to infer that the inclusion of such a standard must mean that behavior less than culpable must not justify debarment. Again, the *Dantran* court was focused on the

51

propriety of a debarment decision, not a suspension decision and a later decision to terminate that suspension. For these reasons, the court does not find that the reasoning behind the *Dantran* court's decision compels a different conclusion in the instant case.

From the plaintiffs' perspective, General Wright determined to suspend them without any evidence of culpable conduct, but rather on the basis of a debatable interpretation of federal law, and without any detailed analysis in support of his position. (Doc. 89, p.29). Further, the plaintiffs argue, that they must have been presently responsible because DESE continued to contract with the government without incident. (Doc. 93, pp. 3-4). In support of this position, the plaintiffs cite *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238 (2001).

As the defendants point out, *Lion Raisins* is also factually distinguishable from the instant case. In *Lion Raisins*, the United States Department of Agriculture ("U.S.D.A.") began an internal investigation disclosing that the plaintiff falsified thirteen raisin certificates between January 1996 and July 1998. In May 1999, the U.S.D.A. Agricultural Marketing Service ("A.M.S.") received the report. The A.M.S. forwarded the report to the U.S.D.A. Office of Inspector General ("O.I.G.") for criminal investigation. Between May 1999 and July 2001, while the criminal investigation was ongoing, various contracting officers within the U.S.D.A. awarded a total of five raisin contracts to the plaintiff averaging 199 tons each. In November 2000, the U.S.D.A. issued an invitation for bids for a much larger raisin requirement (7,000 tons), and the plaintiff was in line for award of the resulting contract. Two months later, in January 2001, Dr. Kenneth Clayton, the suspending official and A.M.S. Associate Director, suspended the plaintiff from contracting for one year because, in his judgment, the prior false certifications represented a "lack of business integrity or business honesty that seriously and directly affect[ed]" the

52

plaintiff's present responsibility. *Lion Raisins*, 51 Fed. Cl. at 241. The plaintiff demanded a hearing before the suspending official, and following an administrative hearing, the suspending official concluded that the plaintiff had not established its present responsibility and upheld the suspension.

In setting aside the suspension, the court assumed that the plaintiff's misconduct constituted a proper basis for suspension under FAR § 9.407-2(a)(7). However, in granting the plaintiff's motion for summary judgment on the issue, the court found the suspending official abused his discretion when he determined that the evidence of plaintiff's lack of integrity, which was known by the agency as early as May 1999, seriously and directly affected the plaintiff's "present" responsibility twenty months later. The court's decision was impacted by the fact that the U.S.D.A. awarded the plaintiff five contracts between the completion of the May 1999 internal investigation and the decision to suspend in January 2001.

In its decision, the court held that because U.S.D.A. contracting officers are required to make an affirmative finding of present responsibility under the FAR before awarding each contract and because the suspension officer personally knew of the five interim contracts as demonstrated by the incorporation of the contracts into the administrative record and by his reference to them in his final decision, the suspending official's act of ordering an immediate suspension and upholding the suspension following the hearing, without any additional evidence on the issue of immediacy, was arbitrary and capricious. The court reasoned that by awarding the contracts, the agency affirmed that the plaintiff's business practices met the standards for present responsibility, rendering the subsequent suspension action defective. Because the suspending official could not cite any event bearing on the plaintiff's present responsibility between the

53

award of the five contracts and his decision to suspend the plaintiff, the court found that his

finding of a lack of present responsibility was arbitrary.

The defendants argue that none of the operative facts found in *Lion Raisins* are present in

the instant case. Specifically, the defendants state:

> The most important factual distinction in the present case is that, unlike in
> *Lion Raisins*, there is no longer a suspension action to criticize. Further, there
> were no completed investigation reports at the agency's disposal at anytime prior
> to suspension, unlike in lion Raisins, where a completed USDA investigation
> report was provided to the suspending official's office. In the present case, the
> CID investigation was completed on July 8, 2002, nearly eight months following
> the suspension action. Most importantly, General Wright terminated the
> suspension actions in December 2002, finding plaintiffs presently responsible; the
> SDO in Lion Raisins did not. Accordingly, defendants believe the Court's
> analysis should end here. If, however, the Court determines further analysis is
> necessary, defendants offer the following.

> In September 1999, at the conclusion of the lobbying activities contained
> within the "Titan Activities Report," an audit of the DESE contract led to an
> investigation into plaintiffs' irregular billing practices by the Army's Criminal
> Investigation Command. In November 1999, CID coordinated its internal
> investigation with the Army's Procurement Fraud Division (PFD) who initiated a
> case concerning the plaintiffs. While the internal investigation was ongoing, on
> May 11, 2001, PFD received key evidence which formed the basis for the
> plaintiffs' suspension actions – the "Titan Activity Reports."

> Faced with this undisputed information, PFD took immediate action,
> unlike the USDA in *Lion_Raisins*. Between May 2001 and November 2001, in an
> attempt to seek a way out of taking adverse action, PFD asserted the Army's right
> to challenge the plaintiffs' questionable billing activities by actively engaging
> plaintiffs and their counsel in a series of show cause notices, letters, emails, and a
> meeting between counsel, all in an attempt to gather more information and resolve
> the outstanding issues in the case. It was only after PFD determined that the
> plaintiffs could not distinguish between allowable and unallowable costs that an
> immediate need arose to protect the government from other such billings in the
> various contracts that plaintiffs, at that time, were performing for the government.

> When presented with these circumstances and the undisputed evidence in
> the Titan Reports, General Wright found a lack of present responsibility and
> temporarily suspended plaintiffs. Unlike *Lion Raisins*, where the suspending

official cited no event bearing on plaintiff's present responsibility between the award of the five contracts and his decision to suspend, in the present case, PFD and General Wright cited plaintiffs' continuing inability to distinguish between allowable and unallowable costs as one of the reasons for issuing the suspensions. General Wright later terminated the suspensions following plaintiffs' administrative hearing – a critical distinction between *Lion Raisins* and the present case. The present case is wholly distinguishable and does not suffer from the same factual defects the court faced in *Lion Raisins*. Accordingly, the Court should disregard it as controlling law in this case.

(Doc. 91, pp. 43-44).

The court agrees with the defendants. First, *Lion Raisins* is factually distinguishable. Second, plaintiffs' relief in *Lion Raisins* was termination of the suspension - - relief that the instant plaintiffs have already received. The plaintiffs herein have not presented the court with any authority that suggests that the plaintiffs are entitled to any relief in addition to that already received.

The plaintiffs next argue that they will be irretrievably harmed if the suspension is not voided *ab initio*. The plaintiffs maintain that although General Wright's December 19, 2002 letter attempted to downplay the effect his suspension would have on the plaintiffs, describing it as merely four days, they will feel real and tangible effects from his suspension. (Doc. 89, p. 30). The plaintiffs assert further that their past performance of government contracts will necessarily be a crucial component of any future decision by the government on whether to award DESE additional contracts; and that regardless of what General Wright may believe, the suspension will be a disqualifying factor in future procurements that they might seek. Specifically, the plaintiffs claim that "the suspension will effectively eliminate DESE's ability to win future contracts," and that "General Wright either misapprehends or ignores the consequences that will be visited upon Plaintiffs as a result of his suspension decision." (Doc. 89, pp. 30-31).

55

The defendants respond that statutory remedies are available to address the plaintiffs'

claims of harm.  Additionally, the defendants offer the following:

> Plaintiffs ask this Court to depart from reality and intervene against what they
> have contrived as the imminent death of DESE Corporation.  In doing so,
> plaintiffs paint a grim portrait of their industry and the government with which
> they earnestly seek to do business.  Plaintiffs allege that they 'are no better off
> now than they were prior to this Court's order in September 2002.  There is still a
> permanent record of suspension and misconduct.'  Pl. MFAR at 2.  Plaintiffs seek
> to 'clear their name and remove the cloud that hangs over their futures as a result
> of General Wright's suspension decision.'  Pl. MFAR at 5.  Citing 'lasting and
> catastrophic effect[s]," "dire consequences," and "the prospect of financial ruin . .
> . if the suspensions are allowed to stand, even for a day," plaintiffs ask this Court
> to "terminate the suspensions *ab initio*.  Pl. MFAR 6-7, 29-30.  Plaintiffs are
> certain that for a "fact, the suspension will effectively eliminate DESE's ability to
> win future contracts."  Pl. MFAR at 30.  In making these fantastically speculative
> assertions, plaintiffs point to no illegal effects the terminated suspension actions
> will have on their corporation.  In fact, legal remedies already exist to prevent the
> government or any other contractor from unlawfully depriving plaintiffs of the
> privilege to do future business with the Government.  Accordingly, plaintiffs'
> speculative allegations of "irretrievable harm" are without merit.

(Doc. 91, pp. 44-45).  The defendants further maintain that (1) the plaintiffs are not required to

disclose any prior suspensions or debarments when competing for future contracts because the

certification requirements under FAR § 52.209-5(a)(1)(i)(A) only require contractors to disclose

whether they are currently suspended from Government contracting when competing on a

contract requiring certification and (2) should Contracting Officers and others denigrate

plaintiffs' future proposals and lead to their non-selection as a contractor, the plaintiffs are

protected by the bid protest regulations set out in 4 C.F.R. § 21.

While the defendants recognize that the plaintiffs view the bid protesting regulations as

"impractical, cost-prohibitive, and rarely successful actions," which are, "at best, the last resort of

a wronged contractor," the defendants argue that plaintiffs' characterizations, be they fair or

unfair, "do not provide a legal basis for this Court to fashion a remedy outside what Congress already created for aggrieved government contractors."[32] (Doc. 91, p. 46). Further, the defendants argue, the court should not create additional relief should the plaintiffs not be awarded contracts based upon their temporary suspension because "[d]espite plaintiffs' penchant to seek court-made relief outside of available statutory-based remedies, its disdain does not diminish the validity of the legal remedies provided by statute and regulation." (*Id.*).

Absent authority providing that the court can or should fashion relief for the plaintiffs different from that provided by the C.F.R., this court is disinclined to do so on its own. Because the court's only role in this process is to determine whether General Wright's finding that the plaintiffs violated the FAR and the plaintiffs' subsequent suspension was arbitrary and capricious, the court need not, and opts not, to ascertain what the plaintiffs remedy might be should the government withhold future contracts.

In their conclusion, the plaintiffs assert that the army's "real" motive in suspending the plaintiffs and refusing to terminate the suspensions *ab initio* is to punish them for refusing to admit guilt. Specifically, the plaintiffs assert that "[i]n effect, the Army is saying that one of the reasons Plaintiffs were due to be suspended is that Plaintiffs consistently maintained they were innocent. Such a policy, that requires companies and individuals to confess guilt to avoid harsh punishment – even when holding a good faith belief of innocence – is obviously chilling." (Doc. 89, p. 32). This fundamental interpretation of the defendants' position is the crux of the plaintiffs' case. The court, however, finds that it was not a refusal to admit guilt that motivated

---

[32]The bid protest regulations, 4 C.F.R. § 21, *et seq.*, were promulgated pursuant to the Competition in Contracting Act, 31 U.S.C. § 3551, at seq. The bid protest regulation is the Congressionally-mandated remedy for a contractor allegedly aggrieve during the solicitation, evaluation, or award of a Government contract.

General Wright's decision, but the inability to recognize that costs such as those described in the Hackett Reports are unallowable costs. What the plaintiffs see as persecution, the defendants see as a means to protect Government funds.

Because the court was cognizant that the applicable FARs provide, in part: "The serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and not for purposes of punishment[, and that] [a]gencies shall impose debarment or suspension to protect the Government's interest . . . ," 48 C.F.R. § 9.402, it remanded this matter to General Wright so that he could consider all the remedial measures and mitigating factors, and so that he would have the advantage of the supplemental record that this court allowed. The court is satisfied that General Wright conducted the requisite review. Upon review of that record, as well as a hearing on the matter, General Wright maintains his finding that the plaintiffs violated FAR 31.205-22. However, General Wright considered factors such as the plaintiffs' new policy regarding lobbying type activities, and determined that the plaintiffs are now presently responsible. That determination is due to be upheld under the circumstances.

The court notes that the plaintiffs had an exemplary history prior to the incidents that are the basis of this action. Nonetheless, the court cannot conclude that General Wright's finding was arbitrary and capricious even after an intense review of the voluminous record before it. At the time General Wright imposed the suspension, he did so with adequate evidence that the plaintiffs billed the government for unallowable costs. In an effort to protect the government from any further such billings, because he found that the plaintiffs could not distinguish between allowable and unallowable costs, as evidenced by their inability to recognize that costs such as

those in the Hackett Reports were unallowable, the suspension was ordered. The court cannot find error in his decision as it presently stands.

While the court recognizes that the plaintiffs have been hurt by the suspension and that they regard the suspension as an attack on their integrity, the court cannot step outside the bounds prescribed by the APA. Because the court finds that General Wright did not act arbitrarily or capriciously, did not abuse his discretion in ordering the plaintiffs' suspension, and did not act outside the law, the court cannot void the suspensions *ab initio*. Although this court might reach a contrary result were this matter before it under a different standard of review (e.g. *de novo* or a preponderance of the evidence), it cannot do so under the present circumstances. The plaintiffs' motion for additional relief is, therefore, denied except as provided previously herein with regard to the False Claims Act.

## F. PREVAILING PARTY STATUS

Finally, the plaintiffs argue that they should be declared the prevailing party in this action. Because this ruling constitutes the final determination on the merits, the next issue is whether the plaintiffs' are a prevailing party.[33] The court is faced with somewhat of a dilemma at this juncture. On the one hand it can be argued that the plaintiffs prevailed in that the court granted the temporary restraining order and preliminary injunction and then remanded the case to General Wright for additional consideration, resulting in his termination of the suspensions. On the other hand, it may be argued that the plaintiffs are not necessarily prevailing parties in that the court

---

[33]The "[Equal Access to Justice Act] is a waiver of sovereign immunity which must be strictly construed." *Levernier Constr., Inc. v. U.S.*, 947 F.2d 497, 502 (Fed. Cir. 1991). The EAJA allows the court to make an award against the Government "only to the extent explicitly and unequivocally provided." *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1386 (Fed. Cir. 1983). "Thus, when considering matters under the EAJA, a court must interpret and apply the law strictly, and not attempt to "do equity" in a way that is not in accord with the statute. *Levernier*, 947 F.2d at 502-03.

has determined that General Wright did not act arbitrarily and capriciously when he refused to void the plaintiffs' suspensions *ab initio*.  Under the circumstances, the court finds that these are matters that counsel should be afforded an opportunity to brief.  Accordingly, the court will set forth a briefing schedule in the accompanying order.

## III. CONCLUSION

Premised on the foregoing, the court finds that the plaintiffs' motion for additional relief (doc. 89) is due to be denied in part and granted in part.  The defendants' motion for summary judgment and to strike extra-record evidence is due to be granted in part and denied in part. (Doc. 91).

**DONE**, this the *12th* day of August, 2004.

_____
**JOHN E. OTT**
United States Magistrate Judge